238 P.3d 1211 (2010)
STATE of Washington, Respondent,
v.
Steven Albert RALEIGH, aka Joseph Francis Law, Appellant.
No. 39221-6-II.
Court of Appeals of Washington, Division 2.
September 8, 2010.
*1212 Patricia Anne Pethick, Attorney at Law, Tacoma, WA, for Appellant.
*1213 Edward P. Lombardo, Mason County Prosecuting Attorney's Office, Shelton, WA, for Respondent.
BRIDGEWATER, P.J.
¶ 1 Steven A. Raleigh appeals a jury verdict finding him guilty of first degree unlawful possession of a firearm. We hold that the State proved he possessed a firearm as defined in former RCW 9.41.010(1) (2001) because (1) it was a gun in fact and could have been made operable, and (2) sufficient evidence supports his conviction because the State proved his possession of the firearm. Raleigh also raises several issues in a Statement of Additional Grounds (SAG) that lack merit. We affirm.

FACTS
¶ 2 On October 10, 2008, Deputy R. Bradley Trout responded to a residential burglary-in-progress call involving three individuals. Deputy Trout stopped a vehicle leaving the driveway. Casey LeTourneau drove the vehicle, while Raleigh was the passenger. Officers found the third individual, a woman later identified as Angelina Jay, behind the burglarized house.
¶ 3 While answering questions about her identity, Jay gave Deputy Trout permission to look in the vehicle he had stopped for her identification. Jay's purse sat on top of a Vans shoebox that had holes in the box lid. Deputy Trout looked in the holes and saw a handgun. He backed away from the vehicle, left the shoebox untouched, and sought a search warrant.[1]
¶ 4 Officers impounded the vehicle while they obtained a search warrant. Armed with a search warrant, the officers inspected the vehicle and found two toy guns and one real gun in the shoebox. The real gun was "pitted and rusty[, and l]ooked like it'd been sitting in a puddle of water for who knows how long." IX VRP at 193. The gun still had a magazine in it and a round in the chamber ready to be fired. The crime lab could not lift any fingerprints from the gun.
¶ 5 The State charged Raleigh by third amended information with first degree unlawful possession of a firearm.[2] Raleigh stipulated to having a prior conviction for a serious offense. The jury then had to decide only whether Raleigh possessed a firearm.
¶ 6 At trial, LeTourneau testified that he drove the vehicle, which belonged to a Matthew Logan Arthur, to and from the house they robbed. LeTourneau stated that Raleigh gave directions to the house and that Raleigh put the shoebox in the back of the vehicle that morning. LeTourneau had seen the gun in Raleigh's house the day before the robbery.
¶ 7 Jay testified that Raleigh had given LeTourneau directions to the house that day. According to Jay, although she owned the shoebox, she did not know that Raleigh had placed the shoebox in the vehicle or that the guns were inside. Jay had previously told police that the gun had come from LeTourneau, but explained that when she gave that statement she had been trying to protect Raleigh.
¶ 8 Sergeant E. Bruce Bennett, a firearms expert, also testified. He stated that the gun found was an Egyptian Helwan Brigadier 9mm pistol. He examined the gun for overall functionality. He removed the magazine and found that it was a replacement magazine, bright and shiny. He concluded that the magazine, safety, and slide worked and that the gun would load ammunition into the chamber.
¶ 9 When Sergeant Bennett examined the firing pin, it appeared stuck forward. Sergeant Bennett conducted a test to see if the gun would fire. He placed an 8mm pencil in the bore of the gun and pulled the trigger. If the pencil moved, the gun could fire. Sergeant Bennett did not state the test's result, *1214 but he successfully reperformed the test for the jury.
¶ 10 On the morning of his testimony, the prosecutor had asked Sergeant Bennett to verify if the gun would work. Sergeant Bennett removed the slide, looked at the firing pin, and noticed that the firing pin was inside the channel. He used a drop of penetrating oil, a hammer, and a punch and loosened the firing pin so it would work. Sergeant Bennett stated that these steps did not require specialized training, a person could use tools found in a toolbox. He stated that he did have to take the gun apart to repair the firing pin, but the gun did not need a new firing pin. In addition, Sergeant Bennett found a schematic of the firearm online through a simple Google search. Sergeant Bennett concluded that the gun was operable based on its state when he examined the gun on the morning of his testimony.
¶ 11 The jury found Raleigh guilty of first degree unlawful possession of a firearm.

ANALYSIS

I. Unlawful Possession of a Firearm

A. Raleigh Possessed a Firearm as Defined by Former RCW 9.41.010(1)
¶ 12 Raleigh argues that the State failed to prove that he possessed a firearm because the firearm was not operable on October 10, 2008. The State argues that with minimal time and effort, Raleigh could have made the gun operable by unsticking the firing pin.
¶ 13 A person is guilty of first degree unlawful possession of a firearm if the person owns, has in his or her possession, or has in his or her control, any firearm after having previously been convicted of any serious offense as defined by chapter 9.41 RCW. Former RCW 9.41.040(1)(a) (2005). Raleigh stipulated that he had been convicted of a serious offense, so the only issue before us is whether the gun was a firearm because it was inoperable when he possessed it. Whether an object is a "firearm" within the meaning of former RCW 9.41.010(1) is a question of statutory interpretation that we review de novo. State v. Hunter, 147 Wash. App. 177, 182-83, 195 P.3d 556 (2008), review granted, 169 Wash.2d 1005, 236 P.3d 206 (2010); State v. Faust, 93 Wash.App. 373, 376, 967 P.2d 1284 (1998).
¶ 14 A "`firearm'" is "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." Former RCW 9.41.010(1). A firearm need not be operable during the commission of a crime to constitute a "firearm" within the meaning of former RCW 9.41.010(1). Faust, 93 Wash.App. at 381, 967 P.2d 1284. Instead, the relevant question is whether the firearm is a "gun in fact" rather than a "toy gun." Faust, 93 Wash.App. at 380, 967 P.2d 1284. The Faust court found persuasive that a malfunctioning or unloaded gun (1) can create the same apprehension in a victim as a properly functioning or loaded one; and (2) has potential to inflict violence because it can be fixed or loaded. Faust, 93 Wash.App. at 381, 967 P.2d 1284.
¶ 15 Here, there is no question that the firearm at issue was a gun in fact, not a toy gun. The officer who executed the search warrant found two "toy[]" guns and one "real" gun in the shoebox. IX VRP at 193. Sergeant Bennett identified the gun as an Egyptian Helwan Brigadier 9mm pistol. The firearm held a magazine, was loaded with a round of ammunition into the chamber, and had a working safety and slide. While Sergeant Bennett conducted some repair to the firing pin, this did not make the firearm a toy gun. The firearm was made operable quickly, with little effort, and with tools found in a normal toolbox. Raleigh possessed a firearm as defined by former RCW 9.41.010(1).
¶ 16 Raleigh argues that under State v. Recuenco, 163 Wash.2d 428, 437, 180 P.3d 1276 (2008), a firearm must be operable in order to support a conviction for a firearm enhancement. Raleigh mischaracterizes Recuenco. The issue in Recuenco was whether harmless error analysis applied when the State failed to submit a firearm enhancement to the jury. Recuenco, 163 Wash.2d at 433, 180 P.3d 1276. The State charged Recuenco with a deadly weapon sentencing enhancement, and the jury found Recuenco committed *1215 his crime while armed with a deadly weapon but, at sentencing, the State requested a firearm sentencing enhancement. Recuenco, 163 Wash.2d at 431-32, 180 P.3d 1276. Recuenco faced three years in prison for the firearm enhancement but only one year for the deadly weapon enhancement. Recuenco, 163 Wash.2d at 432, 180 P.3d 1276. The trial court sentenced Recuenco on the firearm enhancement. Recuenco, 163 Wash.2d at 432, 180 P.3d 1276.
¶ 17 The court held that the trial court lacked authority to sentence Recuenco on an enhancement not found by the jury. Recuenco, 163 Wash.2d at 439, 180 P.3d 1276. The court also held that harmless error analysis did not apply in this situation. Recuenco, 163 Wash.2d at 431, 180 P.3d 1276. The cited language Raleigh relies on, that the firearm must be "operable," was cited merely to point out that differences exist between a deadly weapon sentencing enhancement and a firearm sentencing enhancement. Recuenco, 163 Wash.2d at 437, 180 P.3d 1276. That language was not part of Recuenco's holding and is non-binding dicta.
¶ 18 Raleigh argues that Recuenco overruled Faust sub silencio. It does not. As Faust notes, the case Recuenco relies on for the statement that a firearm must be operational, State v. Pam, 98 Wash.2d 748, 659 P.2d 454 (1983), overruled on other grounds by State v. Brown, 111 Wash.2d 124, 761 P.2d 588 (1988), does not hold that the firearm must be operational. Faust, 93 Wash.App. at 379, 967 P.2d 1284. Instead, Pam distinguished a true firearm and a gun-like object incapable of being fired. Faust, 93 Wash. App. at 379, 967 P.2d 1284. Furthermore, State v. Tongate, 93 Wash.2d 751, 613 P.2d 121 (1980), the case Pam relied on, focused on a toy gun versus a gun in fact. Faust, 93 Wash.App. at 379-80, 967 P.2d 1284 (holding that the Tongate language Pam relied on did not limit the definition of a firearm to one capable of being fired during the crime. Rather, the distinction was between a toy gun and a gun "in fact"); Pam, 98 Wash.2d at 753-54, 659 P.2d 454 (citing Tongate, 93 Wash.2d at 755, 613 P.2d 121). Here, there was no question that Raleigh's firearm was a gun in fact. Further, the issue in Recuenco was not whether a defendant had to possess an operational firearm. We adhere to Faust.
¶ 19 Further, even if the State had to prove the firearm was operational, it did so. A firearm that can be rendered operational with reasonable effort and within a reasonable time period is a firearm within the meaning of former RCW 9.41.010(1). State v. Padilla, 95 Wash.App. 531, 535, 978 P.2d 1113, review denied, 139 Wash.2d 1003, 989 P.2d 1142 (1999). Here, the officer used a drop of penetrating oil, a hammer, and a punch to put the firing pin back in place. The repair did not require specialized knowledge or tools, and the officer did the repair in a short amount of time. Thus, the State proved that the firearm was operational and that Raleigh possessed a firearm.

B. Sufficient Evidence Supports Raleigh's Conviction
¶ 20 Raleigh argues that insufficient evidence supports his conviction for first degree unlawful possession of a firearm because the State failed to prove that he (1) possessed a firearm as defined by RCW 9.41.010(1) and (2) had actual or constructive possession of the firearm.
¶ 21 Sufficient evidence supports the jury's verdict if a rational person viewing the evidence in the light most favorable to the State could find each element proven beyond a reasonable doubt. State v. Montgomery, 163 Wash.2d 577, 586, 183 P.3d 267 (2008). An appellant claiming insufficiency of the evidence admits the truth of the State's evidence and all inferences reasonably drawn from it. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are equally reliable, and we defer to the trier of fact on conflicting testimony, witness credibility, and the persuasiveness of the evidence. State v. Thomas, 150 Wash.2d 821, 874-75, 83 P.3d 970 (2004).
¶ 22 As we stated above, Raleigh possessed a firearm as defined by former RCW 9.41.010(1). In addition, sufficient evidence supports the jury's finding of possession because Raleigh constructively possessed the firearm. Possession may be actual or constructive. *1216 State v. Staley, 123 Wash.2d 794, 798, 872 P.2d 502 (1994). To establish constructive possession, the State had to show that Raleigh had dominion and control over the firearm. State v. Nyegaard, 154 Wash. App. 641, 647, 226 P.3d 783 (2010). This control need not be exclusive, but the State must show more than mere proximity. State v. George, 146 Wash.App. 906, 920, 193 P.3d 693 (2008).
¶ 23 LeTourneau testified that he had seen the firearm in Raleigh's house the day before the robbery. He also saw Raleigh place the shoebox containing the firearm in the vehicle that morning. LeTourneau and Jay stated that Raleigh was giving directions to the house, indicating that he was in charge of the events. In addition, Jay did not know that the shoebox was in the vehicle or that the guns were inside. Finally, although Jay had previously told police that the firearm belonged to LeTourneau, she made such statements while she was still trying to protect Raleigh.[3] The jury could infer that Raleigh placed his own firearm in the back of the vehicle the morning of the robbery. That the facts support an alternative theory does not change the result. The jury apparently chose not to believe Raleigh's theory that Jay or LeTourneau possessed the firearm. A reasonable fact finder could find that Raleigh possessed a firearm. Sufficient evidence supports the jury's verdict that Raleigh was guilty of first degree unlawful possession of a firearm.

II. SAG
¶ 24 In his SAG, Raleigh first argues that the trial court erred by allowing Jay to testify about his physical abuse toward her because that testimony had been excluded by a pretrial order in limine. During cross-examination, Raleigh's counsel insinuated that Jay had changed her testimony since her arrest to avoid prison. The trial court allowed the State to rehabilitate Jay's testimony and show that Jay had lied to police just after her arrest because she feared Raleigh. Raleigh's cross-examination made Jay's testimony relevant and more probative than prejudicial. His argument fails.
¶ 25 Raleigh next argues that during a sidebar the prosecutor improperly relied on the definition of firearm as used in RCW 9.94A.120(16).[4] He contends that this denied him the right to be informed of the nature and cause of the accusation against him. Further, Raleigh argues that the information did not give him notice because it alleged alternative means. The information correctly cited former RCW 9.41.040 as the statute under which Raleigh was charged, and it set out the facts that satisfied this crime. See City of Auburn v. Brooke, 119 Wash.2d 623, 629-30, 836 P.2d 212 (1992) (charging document adequately informs the defendant if it lists (1) the elements of the crime charged and (2) a description of the specific conduct that constituted the crime). The information informed Raleigh of the nature of the charges against him.
¶ 26 Raleigh also argues that he was prejudiced because it is unknown if the firearm was operational. As we stated above, Raleigh possessed a gun in fact and the State proved its operability.
¶ 27 Finally, Raleigh argues that the trial court relieved the State of its burden to prove every element of the crime of first degree unlawful possession of a firearm, but he gives no reason. Although he identifies this additional ground for review, RAP 10.10(a), Raleigh does not inform us "of the nature and occurrence of [the] alleged errors." RAP 10.10(c). Therefore, we will not further consider this additional ground. RAP 10.10(c).
¶ 28 Affirmed.
We concur: HUNT and VAN DEREN, JJ.
NOTES
[1] Officers had arrested, handcuffed, and placed all three suspects into separate patrol vehicles at the time Deputy Trout found the handgun. He left the firearm in the vehicle because he had no concern about officer safety. There is no indication that a CrR 3.5 hearing occurred below.
[2] The State also charged Raleigh with residential burglary. The jury convicted Raleigh on that count as well, but he does not appeal that conviction.
[3] Jay claimed she participated in the robbery and lied to police afterwards because Raleigh had a history of physically abusing her and she feared him.
[4] It is worth noting that the statute to which Raleigh cites does not exist.