# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  51531-8-II |
| Respondent, | |
| v. | |
| MICHAEL SHAWN OLSEN, | PUBLISHED IN PART OPINION |
| Appellant. | |

CRUSER, J.  —  Michael Shawn Olsen appeals his conviction and sentence for first degree unlawful possession of a firearm.  In the published portion of this opinion, we expressly reject our prior decision in *State v. Pierce*[1] and hold that the jury was not required to find that the gun Olsen possessed was operable for it to be considered a "firearm" under former RCW 9.41.010(9) (2015). Because of this holding, we also reject Olsen's argument that the evidence was insufficient to support the conviction.

In the unpublished portion of this opinion, we further hold that (1) Olsen has waived the prosecutorial misconduct claim because he fails to show that the alleged misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice and (2) the trial court did not err when it required Olsen to register as a felony firearm offender.

---

[1] 155 Wn. App. 701, 230 P.3d 237 (2010).

Accordingly, we affirm Olson's conviction and the trial court's requirement that Olsen register as a felony firearm offender.

FACTS

I. CHARGES AND PRETRIAL MATTERS

On June 15, 2017, Olsen, who had prior felony convictions, attempted to sell a gun at a local gun shop. After rejecting the gun shop employee's offer, Olsen left the shop with the gun. The gun shop employee contacted the police to verify that the gun was not stolen.

After determining that Olsen was prohibited from possessing firearms, the police contacted and arrested Olsen. The gun was never recovered. The State charged Olsen with first degree unlawful possession of a firearm.

Before trial, while discussing jury instructions, the State alerted the trial court that the focus of the case was going to be whether the gun "was in perfect, working order when the defendant tried to sell it." Verbatim Report of Proceedings (VRP) (Oct. 31, 2017) at 23. The State argued that it had to prove that the unrecovered gun was only a "gun in-fact" and that it could be rendered operational quickly and easily. *Id.* at 26. The trial court deferred ruling on how to instruct the jury on this matter.

II. TRIAL

At trial, the State presented testimony from Steven Vetter, the gun shop employee to whom Olsen had tried to sell the gun. Olsen's sole witness was a firearms expert, Marty Hayes.

A. TESTIMONY

Vetter testified that he worked at the gun shop and was responsible for purchasing used guns. Olsen came into the gun shop and attempted to sell a .22 caliber Ruger revolver that he had

been carrying in a shoulder holster for $250. Olsen did not say there was anything wrong with the gun.

Olsen told Vetter that the gun was loaded. After unloading the gun, Vetter, who was very familiar with this type of gun, visually inspected the gun "to make sure that all the parts were intact in the firearm, that there was no visible missing components, springs, hammer, transfer bar, things that could be removed." *Id.* at 16. Concluding that the gun was in "[p]retty good" condition and not observing any problems with the gun, Vetter offered Olsen $125. *Id.* at 14. Olsen rejected this offer, reloaded and holstered the gun, and left.

In addition to testifying about his encounter with Olsen, Vetter testified that he had extensive experience with guns, that he was trained to "tear guns down" and able to clean and fix them, and that although he did not work as a gunsmith, he regularly worked on his own guns. *Id.* at 7-8. Vetter said that he would not have considered purchasing the gun unless he was satisfied that it was in working condition. Vetter also described his examination of the gun in detail, but he stated that he did not test fire the gun because he did not have the ability to do so at the shop.

Hayes, president and director of the Firearms Academy of Seattle, testified on Olsen's behalf. He reviewed the video from the store, the police report and statements, and the photograph of the gun that Olsen had attempted to sell. Hayes confirmed that the gun was a real gun rather than a toy or replica and opined that test firing the gun was the only way to determine for sure whether the gun would fire.

B. JURY INSTRUCTIONS

After the parties rested, they discussed the proposed jury instructions addressing the definition of the term "firearm." Olsen proposed a jury instruction stating that in order to find a

device to be a "firearm," the jury needed to find that the "device" in question was "capable of being fired either instantly or with reasonable effort and within a reasonable time." Clerk's Papers (CP) at 43. He also proposed an instruction that required the jury to find that the State had presented "sufficient evidence to find a firearm operable under this definition."[2] *Id*. Olsen acknowledged, however, that he was unsure whether these proposed instructions should be given because whether the firearm had to be operational was "muddy water." VRP (Oct. 31, 2017) at 109.

The following day, the trial court announced that it had reviewed the case law regarding whether the State had to prove that the firearm was operable and that this case law was unclear. The trial court chose to give an instruction following WPIC 2.10,[3] which stated, "A firearm is a weapon or device from which a projectile may be fired by an explosive such as gunpowder." CP at 48.

C. CLOSING ARGUMENTS

In its closing argument, the State focused on whether it was required to prove that the gun was operational. The State argued that the evidence established that the gun met the definition of "firearm" in the jury instruction.

Olsen's argument focused on whether or not the gun met the definition of "firearm." Olsen referred the jury to the instruction defining the term "firearm" and told the jury that although the State argued about what this instruction meant, it was the jury's job "to go back and decide what

---

[2] Olsen cited our decision *Pierce*, 155 Wn. App. at 714, as the source of this instruction.

[3] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.10, at 60 (4th ed. 2016) (WPIC).

you believe this specific language [in the instruction] means." VRP (Nov. 1, 2017) at 152. Olsen

then argued that the phrase "[m]ay be fired by an explosive such as gun powder" required the jury

to determine whether the gun would actually fire. *Id.* In rebuttal, the State again argued that the

evidence demonstrated that the firearm was "legally a firearm" based on the jury instructions. *Id.*

at 158.

The jury found Olsen guilty of first degree unlawful possession of a firearm. Olsen appeals.

ANALYSIS

Olsen contends that the trial court erred when it failed to instruct the jury that it had to find

that the gun he possessed was operable in order to find that it was a "firearm" and asserts that the

evidence was insufficient to prove that the gun was operable.[4] We reject these claims.

FIREARM DEFINITION

Citing *State v. Recuenco*, 163 Wn.2d 428, 180 P.3d 1276 (2008), and *Pierce*, Olsen

contends that the jury instructions relieved the State of the burden of proving every element of the

offense because the instructions did not require the State to prove that the gun was operable and

that the State failed to prove the unlawful possession of a firearm charge because the evidence was

insufficient to prove the gun he attempted to sell was operable. The premise underlying both of

these claims is that the State was required to prove that the gun was operable to meet the statutory

definition of a firearm under former RCW 9.41.010(9), which defines "firearm." We hold that

Olsen fails to show that he is entitled to relief on these grounds.

---

[4] Olsen raises this issue in his statement of additional grounds for review (SAG). RAP 10.10.

A. LEGAL PRINCIPLES

Whether the State was required to prove that Olsen's gun was "operational" is a question of law that we review de novo. *State v. Raleigh*, 157 Wn. App. 728, 734, 238 P.3d 1211 (2010).

B. CONFLICTING CASE LAW

In April 2010, we issued *Pierce*, in which we held that in order to prove a firearm enhancement, the State had to present evidence that the defendant's weapon was an "operable" gun to establish that the weapon met the legal definition of a firearm.[5] 155 Wn. App. at 714. In reaching this conclusion, *Pierce* relied on *Recuenco*, 163 Wn.2d at 437, which, in turn, relied on *State v. Pam*, 98 Wn.2d 748, 659 P.2d 454 (1983), *overruled in part on other grounds by State v. Brown*, 111 Wn.2d 124, 754-55, 761 P.2d 588 (1988).

A few months later, in September 2010, we issued *Raleigh*, 157 Wn. App. at 734-36. In *Raleigh*, which addressed an unlawful possession of a firearm conviction, we rejected the argument that under *Recuenco*, a gun must be operable during the commission of the crime to qualify as a firearm within the meaning of former RCW 9.41.010 (2001). *Raleigh*, 157 Wn. App. at 734-36. Although *Raleigh* did not acknowledge *Pierce*, *Raleigh* expressly distinguished *Recuenco*, holding that the language in *Recuenco* referring to the operability of the firearm was "nonbinding dicta." *Raleigh*, 157 Wn. App. at 735.

In *Raleigh*, we also held that the controlling law was *State v. Faust*, 93 Wn. App. 373, 967 P.2d 1284 (1998), which held that "[a] firearm need not be operable during the commission of a crime to constitute a 'firearm' within the meaning of former RCW 9.41.010(1)" and that the

---

[5] Although *Pierce* addressed a sentencing enhancement rather than an unlawful possession of a firearm charge, it addressed the same definition that is at issue here.

relevant inquiry was "whether the firearm is a 'gun in fact' rather than a 'toy gun.'"[6] 157 Wn. App. at 734.

More recently, in *State v. Tasker*, 193 Wn. App. 575, 581-82, 373 P.3d 310 (2016), Division Three of this court followed *Raleigh*.[7] As we did in *Raleigh*, *Tasker* acknowledged that the language in *Recuenco* relied on in *Pierce* was nonbinding dicta. *Tasker*, 193 Wn. App. at 592 (citing *Raleigh*, 157 Wn. App. at 735-36). Acknowledging *Raleigh*, Division Three stated, "[W]e disagree with the suggestion in *Pierce* that the State must always present evidence specific to operability at the time of the crime." *Tasker*, 193 Wn. App. at 593-94.

C. DISCUSSION

Both Division Three in *Tasker* and this court in *Raleigh* have "characterized *Recuenco*'s statement about the requirement of 'sufficient evidence to find a firearm operable' as nonbinding dictum," emphasizing that this statement was intended "'merely to point out that differences exist between a deadly weapon sentencing enhancement and a firearm sentencing enhancement.'" *Tasker*, 193 Wn. App. at 591 (quoting *Raleigh*, 157 Wn. App. at 735-36). We agree that the language in *Recuenco* was dicta. *Recuenco* was not examining whether operability was required. It was, instead, examining "whether Washington law requires a harmless error analysis where a sentencing factor, such as imposition of a firearm enhancement based on a deadly weapon finding, was not submitted to the jury." 163 Wn.2d at 431. And *Recuenco* relied on *Pam*, which merely

---

[6] Despite the conflict between *Pierce* and *Raleigh*, our Supreme Court denied review of *Raleigh*. *State v. Raleigh*, 170 Wn.2d 1029 (2011).

[7] *Tasker* is the only published case addressing whether a firearm has to be operational that cites *Raleigh* or *Pierce*.

used the term "operability" in passing when evaluating whether there was evidence establishing that a device was more than a "gun-like object." *Pam*, 98 Wn.2d at 754.

Additionally, former RCW 9.41.010(9) (2015), which was the statute in effect at the time of the crime, defined "firearm" as "a weapon or device from which a projectile or projectiles *may* be fired by an explosive such as gunpowder." The plain language of the statute does not require that the gun be "operational" at the time of the offense.

Thus, we agree with *Tasker* and *Raleigh* and hold that the State was not required to prove that the firearm was operable at the time of the offense. In doing so, we expressly reject the analysis in *Pierce*. As Olsen's sufficiency claim and his jury instruction challenge both rest on this failed premise, he is not entitled to relief on these grounds.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

I. PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Olsen next asserts in both his opening brief and in his SAG that portions of the State's closing argument and rebuttal constituted prosecutorial misconduct. Olsen has waived these arguments.

A. ADDITIONAL FACTS

In addition to the closing argument described above, the State argued,

> Now - so what do you have left? Attack the firearm, because it was never recovered, right. And there's a definition of firearm in your jury instructions. A weapon or device by which a projectile may be fired by an explosive, such as gun powder. Okay. It seems like it's pretty obvious. Here's what it doesn't say. It doesn't say a firearm is a weapon or device by which a projectile can be fired by an explosive such as gun powder. It doesn't say can, it says may, and there's a reason

for it. Because it defies reason to think that it's okay for somebody who has lost their firearm rights to have a firearm in their possession just because the firing pin is broken, just because it's unloaded.[8]

. . . .

. . . Just because there's some little thing wrong with it, that maybe prevents it from operating right at the moment when the police catch you, when the police catch the person that's not allowed to have the firearm. Okay. So there is evidence that you've heard, both circumstantial and opinion, that the gun - the revolver in this case probably worked just fine. You heard from Mr. Vetter and you heard from Mr. Hayes. Now, remember, there's only - there's only two people involved in this case who have actually handled that weapon, Mr. Vetter and the defendant. Mr. Vetter gave it a looking over, certainly not as thorough as Mr. Hayes would have, apparently. But he was satisfied that even if it wasn't in perfect working condition, it was - he was willing to put down money for it, 100 bucks, more if he brought back a .22 long round cylinder. It's almost half what the thing's value is new.

Now, certainly the firing pin could have been sanded down or broken, or at least - or the cylinder might not have been perfectly in time. But who cares? *The person on the street who gets a firearm stuck in their face and a demand for your money or your life, do you think they think, you know maybe the firing pin doesn't work. The police officer shows up to a domestic disturbance and one of the parties is waiving around a revolver. Do you think the police officer thinks, gee, I wonder if that cylinder is in perfect time? No, it doesn't matter. That's why the squishy language is may, not can.* You don't want to create - people that wrote these laws don't want to create an imperative. The firing arm [sic] perfectly working when the person gets caught. It's enough that it worked at some point, a reasonable time before or after the incident, that it's a real gun.

That's the point, folks, that it's a real gun, not a toy, not a replica. It's not, you know, the - the robot that transforms into a gun. It's not a BB gun. Okay. Because, remember, there's one other person here that has handled that weapon, maybe even fired it, the defendant. And there's evidence that he thinks it works and that he thinks it's a real gun. It's loaded and - when he hands it to Mr. Vetter, right. And why would you carry a broken gun?

I give it - I give you that - that many of you - maybe all of you have a drawer full of broken cell phones at home or cell phones that don't work anymore at home, right. But do you carry them? Do you carry them around with you after they don't work? So old flip phones, the original [iP]hone in - your current phone, right. Haul it in your purse, your pocket, your car. No, you carry it because it works or you're taking it to the shop, I suppose. He was carrying this thing around in a shoulder holster, not in a bag, not in a box.

---

[8] Olsen objected at this point, arguing only that this was "[i]mproper argument." VRP (Nov. 1, 2017) at 144. The trial court overruled the objection. Olsen did not object to any of the remaining argument.

VRP (Nov. 1, 2017) at 143-46 (emphasis added).

In rebuttal, the State argued,

The operability of the firearm. Folks, it is up to you whether this weapon, that was never recovered, was gone [sic]. This revolver, it's [a] firearm as the Court has instructed. Okay. I told you a little bit about why [jury instruction seven is] worded the way it is. *How many pistols, guns, firearms, you think have been tossed over the Chehalis River bridge? The Hoquiam River bridge? Over on the Wishkah? Somebody committed a crime with a gun and they needed to get rid of it. Do you really think that people who wrote these laws wanted all of those people to get away with it just because they got rid of that gun so well that nobody could ever find it? Of course not. Of course not. That's why it's written in there.*
The evidence that this firearm was legally a firearm is actually pretty strong. Like I said, Mr. Hayes testified that he's looked up a serial number, Mr. Vetter inspected the thing. And there's no reason to believe that the defendant didn't believe it was. After all, he gave the BB gun excuse. *Only - only a lawyer could argue that a gun like that wasn't a firearm, right*.

*Id.* at 158-59 (emphasis added). Olsen did not object to the State's rebuttal.

B. DISCUSSION

To prevail on a prosecutorial misconduct claim, the appellant must establish that the prosecutor's conduct was both improper and that the improper conduct was prejudicial in the context of the entire record and the circumstances at trial. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). But the appellant waives any error if he or she fails to object to the alleged misconduct "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). When evaluating an unpreserved prosecutorial misconduct claim, "[r]eviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured. 'The criterion always is, has such a feeling of prejudice been engendered or located in the minds of the jury as to

prevent a [defendant] from having a fair trial?'" *Id.* at 762 (second alteration in original) (quoting *Slattery v. City of Seattle*, 169 Wash. 144, 148, 13 P.2d 464 (1932)).

Directing us to the italicized portions of the State's closing argument and rebuttal set out above, Olsen argues that the State's references to "domestic disturbances involving firearms and guns being tossed into rivers because someone committed a crime" went beyond the evidence and appealed to the jury's passion and prejudice.[9]  Br. of Appellant at 13.  But to the extent this argument was error, Olsen does not show that it was so prejudicial that it could not have been cured by a proper instruction.  This argument was made in the context of the State discussing why it was unnecessary for the jury to consider whether the gun was "operable" in order to find that it was a "firearm."  The State did not suggest that Olsen himself had committed any offense other than the unlawful possession of a firearm with which he was charged.  Because an instruction limiting this argument to its intended purpose could have cured any potential prejudice, Olsen has waived any error.

In his SAG, Olsen also asserts that the State argued facts not in the record when it argued, "Because, remember, there's one other person here that has handled that weapon, maybe even fired it, the defendant.  And there's evidence that he thinks it works and that he thinks it's a real gun." VRP (Nov. 1, 2017) at 146.  Even assuming, but not deciding, that this argument was improper, Olsen does not show that it was so flagrant and ill intentioned that it could not have been cured by

---

[9] Olsen did not object to this argument at trial.  On appeal, Olsen does not address whether the alleged error was so flagrant and ill intentioned that it could not have been cured by a proper instruction.  We take this opportunity to remind counsel that when no objection has been made, it is the appellant's burden to establish that the alleged error was not so flagrant and ill intentioned that it could not have been cured by a proper instruction.  *See Emery*, 174 Wn.2d at 760-61.

a proper instruction advising the jury to ignore this testimony. Accordingly, Olsen has waived any error.

## II. FELONY FIREARM OFFENDER REGISTRATION REQUIREMENT

Olsen argues that the trial court erred in imposing the felony firearm offender registration requirement because the court failed to consider (1) his youthfulness, immaturity, and inability to "'appreciate risks and consequences'" at the time of his prior offenses, (2) the fact that other than failures to register, he had not committed any new offenses in 10 years suggesting that "there was no indication of a continuance or escalation of serious offense behavior," and (3) the fact the firearm related to this charge had not been used in any crime. Br. of Appellant at 9 (quoting *State v. Houston-Sconiers*, 188 Wn.2d 1, 23, 391 P.3d 409 (2017)). We disagree.

A. ADDITIONAL FACTS

In its sentencing memorandum and at the sentencing hearing, the State argued that the trial court should require Olsen to register as a felony firearm offender under RCW 9.41.333. The State argued that this requirement was appropriate because Olsen possessed a concealed firearm and voluntarily entered a gun store despite knowing he could not possess firearms, his criminal history demonstrated a history of violence and disregard for "the requirements of his prior convictions," and he had recently been held in contempt of court.[10] CP at 56. Olsen's counsel asked the trial court not to impose the registration requirement because he did not "think it[ was] necessary in this particular case." VRP (Nov. 13, 2017) at 55.

---

[10] Olsen was held in contempt during his first court appearance in this matter for disrupting the proceedings. He apologized to the court the next day and asserted that he had been "detoxing" the day before. VRP (June 20, 2017) at 2.

The trial court imposed the felony firearm offender registration requirement commenting that it thought this was "a good idea." *Id.* at 58. Before imposing the registration requirement, the trial court discussed (1) the nature of the current offense, (2) its concern that Olsen had concealed the gun and that the gun was loaded, (3) Olsen's prior criminal history,[11] which included a juvenile child molestation conviction, a second degree assault, and six failures to register as a sex offender, and (4) the fact Olsen had been advised "close to a dozen times . . . over the years" that he could not possess firearms and still did so. *Id.* at 557.

When the trial court mentioned the number of times that Olsen had been advised of the firearm restriction and commented that it hoped that Olsen was now "older" and more "mature" than he was when he committed his prior offenses, Olsen responded that he had been "young, and . . . dumb" so he did not "pay attention." *Id.* The trial court responded that Olsen was now 30, so it was time to "change [his] ways" and use his time in prison to his advantage. *Id.* On the judgment and sentence, the trial court noted that it was imposing the registration requirement because of Olsen's criminal history and evidence of his propensity for violence that would likely endanger persons.

B. DISCUSSION

Under RCW 9.41.330(1), the trial court must decide whether to exercise its discretion and require a defendant convicted of a felony firearm offense to register as a felony firearms offender

---

[11] Olsen had 14 prior convictions. These convictions were for (1) first degree child molestation (1999), (2) two counts of third degree theft (2002 and 2004), (3) second degree identity theft (2005), (4) bail jumping (2006), (5) two counts of use or delivery of drug paraphernalia (2006), (6) second degree assault (2006), (7) obstruction of justice (2006), and (8) six counts of failure to register as a sex offender (2003, two in 2004, 2005, 2008, and 2012). Olsen was born in 1987.

under RCW 9.41.333. In determining whether to exercise its discretion, RCW 9.41.330(2) provides that the trial court "shall" consider "all relevant factors," including three specific, nonexclusive factors: (1) the defendant's criminal history, (2) whether the defendant had "previously been found not guilty by reason of insanity of any offense," and (3) evidence of the defendant's "propensity for violence that would likely endanger persons."

Because the trial court's decision to impose the registration requirement is discretionary, we review the decision for abuse of discretion. *State v. Sherman*, 59 Wn. App. 763, 767 n.2, 801 P.2d 274 (1990) (citing *State ex. rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). A trial court abuses its discretion if its decision "'is manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

Olsen contends that the trial court abused its discretion by not also considering "the circumstances related to Mr. Olsen's youth at the time of [his juvenile offenses] -- his age, the hallmarks of 'immaturity, impetuosity, and failure to appreciate risks and consequences' of his action." Br. of Appellant at 10 (quoting *Houston-Sconiers*, 188 Wn.2d at 23). But contrary to Olsen's contention, the record shows that the trial court considered his former youth and current maturity. The court knew Olsen's criminal history, which included the dates of his prior offenses. And the court and Olsen discussed Olsen's youth when he committed his prior offenses and how he was now more mature and could "change [his] ways." VRP (Nov. 13, 2017) at 57. Because the court was aware of Olsen's youth at the time he committed his prior offenses, Olsen does not show that the trial court failed to take that into account when it concluded that Olsen's criminal history supported the need for the registration requirement.

Olsen also asserts that the trial court failed to consider that he had not committed any new offenses, apart from his failures to register, for over 10 years before he committed his current offense. Olsen further argues that the court did not consider the fact that Olsen could have been telling the truth about why he had the gun[12] and that there was no evidence that the gun had been used in a crime. These arguments appear to relate to whether the court properly concluded that Olsen's propensity for violence would likely endanger persons.

Again, the record shows that the trial court was aware of Olsen's criminal history including the types of prior offenses he had committed and when he committed those offenses before it imposed the registration requirement. And nothing suggests that the court did not consider the fact that none of the violent crimes or crimes against others were recent. The court was also aware of the evidence presented at trial, and there is no reason to conclude that the court did not consider Olsen's testimony before imposing the registration requirement. But even though none of Olsen's more recent offenses were violent offenses or offenses against others, the court expressed concern that Olsen had been walking around with a loaded and concealed weapon, which clearly increased the risk of harm to the public and to law enforcement. Thus, we cannot say that the court abused its discretion when it found that Olsen had a propensity for violence and that this factor supported the registration requirement.

---

[12] In a statement to the arresting officer, Olsen had asserted that he thought the gun was a BB gun until Vetter opened it and that he (Olsen) was selling it for a friend.

No. 51531-8-II

We affirm Olsen's conviction and the trial court's requirement that Olsen register as a felony firearm offender.

CRUSER, J.

We concur:

MAXA, C.J.

LEE, J.