**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86741-5-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| MARCUS BRADLEY WILLIAMS, | |
| Appellant. | |

FELDMAN, J. — Marcus Bradley Williams appeals his convictions and sentence for second degree felony murder predicated on second degree assault with a deadly weapon, two counts of drive-by shooting, and two counts of first degree unlawful possession of a firearm. He asserts (a) the State presented insufficient evidence to prove beyond a reasonable doubt that he committed the charged offenses, (b) the felony murder conviction violates substantive due process, (c) the trial court exceeded its statutory authority when it included his juvenile convictions in calculating his offender score, and (d) the trial court's restitution order is unconstitutionally excessive. Because sufficient evidence supports the convictions and Williams has not otherwise established an entitlement to relief, we affirm.

I

The charges at issue here stem from three different incidents over a span of 18 days in January 2021.  First, the State alleged that on January 6, Williams and an accomplice shot at two young men who had been playing basketball near Othello Park in Seattle.  Second, the State alleged that on January 7, Williams and an accomplice shot and killed Jovan Satterwhite in Kent.  Third, the State alleged that on January 23, Williams and an accomplice shot at two young men, wounding them, following an automobile collision in Shoreline.  As discussed in detail below, law enforcement investigated these shootings and marshalled compelling evidence connecting Williams to each of the alleged crimes.

The State ultimately charged Williams with second degree felony murder predicated on second degree assault with a deadly weapon, two counts of drive-by shooting, and two counts of first degree unlawful possession of a firearm.  The ensuing trial was bifurcated into two phases.  In the first phase, the jury found Williams guilty of felony murder and two counts of drive-by shooting and returned a special verdict that Williams was armed with a firearm when he committed the felony murder.  Prior to the second phase, Williams stipulated he "had previously been convicted of a serious offense."  The jury was then provided with additional instructions regarding the two counts of unlawful possession of a firearm and found Williams guilty of those counts as well.

During sentencing, the trial court included Williams' three juvenile convictions in determining his offender score and imposed a standard range sentence totaling 457 months in prison.  The court also ordered Williams to pay

$40,000 in restitution, with interest, to the Crime Victims Compensation Program (CVCP). This timely appeal followed.

II

A. <u>Sufficiency of the Evidence</u>

Williams argues the State failed to prove he committed the charged offenses either as a principal or as an accomplice. We disagree.

The jury was instructed that to convict Williams of felony murder, the State must prove beyond a reasonable doubt that Williams committed assault and, in furtherance of the assault, caused the death of Satterwhite. The jury was instructed on liability as a principal and as an accomplice, and that an intentional shooting of another person with a firearm amounted to second degree assault. Additionally, the jury was instructed that to convict Williams of drive-by shooting, the State must prove he recklessly discharged a firearm in a manner that created a substantial risk of death or serious injury to another person from the immediate area of a motor vehicle that was used to transport him to the area. Lastly, the jury was instructed that to convict Williams of first degree unlawful possession of a firearm, the State must prove he knowingly owned or had possession or control of a firearm while having been previously convicted of a serious offense.

In determining whether sufficient evidence supports the jury's verdict, we must assess "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Zghair*, 4 Wn.3d 610, 619-20, 567 P.3d 1 (2025) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Our standard of review in a challenge to the sufficiency

of the evidence is "'highly deferential to the jury's decision.'" *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024) (quoting *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014)). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Also, "[c]ircumstantial and direct evidence are equally reliable, and we defer to the trier of fact on conflicting testimony, witness credibility, and the persuasiveness of the evidence." *State v. Raleigh*, 157 Wn. App. 728, 736-37, 238 P.3d 1211 (2010). Applying this deferential standard, we conclude there is sufficient evidence to support the jury's verdict as to each of the charges.

Starting with the felony murder charge, surveillance videos admitted at trial show a silver Mazda sedan and a white Crown Victoria sedan following Satterwhite driving his Buick into his apartment complex in Kent near midnight on January 7, 2021. The video also shows that Williams drove the silver Mazda, which was owned by his girlfriend, Katherine Brostrom, and Kyrie Jackson, Williams' close friend, drove the white Crown Victoria. Witnesses at the apartment complex heard three gunshots followed by tires squealing and an engine accelerating and saw a silver sedan speeding away. Surveillance videos also captured the silver Mazda and white Crown Victoria fleeing the scene of the shooting.

When law enforcement responded to the shooting, they found Satterwhite dead in his Buick with an obvious gunshot wound on the left side of his head. They found a fired 9 mm bullet lodged in the Buick's passenger seat pad. Washington State Patrol (WSP) firearms specialist Renee Hudson examined the fired 9 mm bullet and determined it could have been fired from eight possible firearms,

including a Canik 9 mm pistol. This is significant because, approximately 13 minutes before Satterwhite's murder, Williams had taken a video of two pistols, a two-tone Canik 9 mm SPX and an Fabrique Nationale (FN) Five-seveN 5.7 x 28 caliber pistol, lying on his lap as he was driving. Also, Williams' Snapchat location data placed his phone just west of the Kent crime scene about three minutes before Satterwhite was killed. This data also showed Williams' phone traveling away from the murder scene immediately after the shooting. Moreover, Williams made a "selfie" video less than 10 minutes after Satterwhite was shot which reveals he was then just a few miles from the murder scene.

Law enforcement also determined that about an hour before Satterwhite's murder on January 7, Williams messaged an unknown person about selling his gun: a "Canik 9" that was "2 tone black and grey." At 10:40 p.m., Williams messaged the person, "I got it on me." A few days later, Jackson had a conversation with someone to sell Williams' Canik pistol, and it was never recovered by law enforcement. Williams' phone also revealed searches made in the days after Satterwhite's murder for "shooting in Kent," "Kent shooting," and "Q13 news." Law enforcement also found on Williams' phone a cached image of Satterwhite's Buick surrounded by crime scene tape from a news story, which meant the news story had been viewed on Williams' phone. Viewed favorably to the State, this is sufficient evidence to support the conviction for felony murder.

Turning to the Othello Park drive-by shooting on January 6, the evidence at trial shows that Jordon King and Kadeem Hinton were sitting in King's vehicle around 7:20 p.m. when King noticed someone staring into his vehicle from a silver Mazda on his left. When King started driving Hinton home, "bullets just started

flying at [his] car" from the silver Mazda. While no one was injured, King's vehicle was damaged by the bullets. King saw two people standing by the silver Mazda, one of whom was standing and shooting at him from the driver's side of the car. Law enforcement recovered 13 10 mm cartridge casings, 15 9 mm cartridge casings, and a 9 mm fired bullet from the scene, and determined the 9 mm bullet was fired from the same firearm as the 9 mm bullet found in Satterwhite's Buick. Snapchat location data established that Williams' phone was near the shooting around 7:21 p.m. Additionally, there was a January 6 search on Williams' phone for "Seattle shooting," "Q13," and "KIRO." Viewed favorably to the State, sufficient evidence supports the conviction for the Othello drive-by shooting.

As to the Shoreline drive-by shooting on January 23, witnesses heard a vehicle crash, male voices yelling, and gunshots near midnight, and a witness saw the silhouettes of young men near two vehicles when the shooting occurred. Meron Hailemariam and Lahraj Garrett were shot and received severe injuries requiring medical attention. The Toyota Prius they were driving at the time was damaged by several bullet holes and had white paint transfer on its bumper and blood on its exterior. Law enforcement found three spent shell casings, one of which was a 5.7 x 28 caliber casing, and collision debris in the road. WSP firearms specialist Hudson determined that Brostrom's FN pistol—the same pistol pictured on Williams' lap in the above-described video—had fired the 5.7 x 28 caliber cartridge casing recovered from the scene. Although Brostrom owned the FN pistol pictured in the video, Williams would often carry it without Brostrom's permission, the pistol had Williams' DNA on it, and law enforcement recovered it from a vehicle Williams had driven and parked at Harborview Medical Center.

Also, cell tower location data placed Williams' phone near the collision and shooting shortly after midnight, and a GPS tracker that law enforcement had attached to Jackson's white Crown Victoria for an unrelated matter placed the vehicle near the scene when the collision and shooting occurred. This is sufficient evidence to support the conviction for the Shoreline drive-by shooting.

Lastly, as to the first degree unlawful possession of a firearm on January 7 and January 23, Williams stipulated he "had previously been convicted of a serious offense" that would make it illegal for him to knowingly own, possess, or control a firearm. As detailed above, Williams' phone contained pictures of a Canik pistol and Brostrom's FN pistol on his lap on January 7. Additionally, Brostrom's FN pistol, the firearm used to shoot and injure Hailemariam and Garrett during the Shoreline shooting on January 23, was recovered from the vehicle that Williams drove to Harborview and had Williams' DNA on it. Accordingly, the State presented sufficient evidence—including ballistics evidence, location data, text messages, videos, photos, and witness testimony—to persuade a rational jury that Williams was guilty of all the charged offenses.

Despite the foregoing evidence, Williams argues the State presented no direct evidence that he committed any of the offenses and instead relied solely on speculative inferences. But the jury was instructed that circumstantial evidence is just as reliable as direct evidence, and "[i]t is the province of the finder of fact, not the appellate court, to determine what conclusions reasonably flow from the particular evidence in a case." *Zghair*, 4 Wn.3d at 624. Williams also argues that while some evidence exists that could support the jury's verdict, other evidence suggests he was innocent. But the State's evidence supporting the convictions

"need not be inconsistent with a hypothesis of innocence." *See State v. Couch*, 44 Wn. App. 26, 30, 720 P.2d 1387 (1986). "An essential function of the fact finder is to discount theories which it determines unreasonable because the finder of fact is the sole and exclusive judge of the evidence, the weight to be given thereto, and the credibility of witnesses." *State v. Bencivenga*, 137 Wn.2d 703, 709, 974 P.2d 832 (1999). We decline to disturb the jury's resolution of these issues.

B.     Substantive Due Process

Williams argues Washington's felony murder doctrine, as applied to him, violates fundamental fairness and substantive due process. We disagree.

Preliminarily, we may properly review Williams' due process claim even though he raises it for the first time on appeal. Under RAP 2.5(a)(3), this court may address such an issue for the first time on appeal if the claimed error is a "manifest error affecting a constitutional right." Washington courts have long held that "being charged, convicted, and sentenced pursuant to an unconstitutional charging statute qualifies as a manifest error affecting a constitutional right." *State v. Rice*, 174 Wn.2d 884, 893, 279 P.3d 849 (2012); *State v. Ruff*, 122 Wn.2d 731, 733 n.1, 861 P.2d 1063 (1993). Consistent with these legal principles, Williams argues that the felony murder statute is unconstitutional and that his corresponding conviction therefore qualifies as a manifest error affecting a constitutional right. He asserts three such arguments, each of which is discussed in turn below.

First, Williams argues the felony murder statute violates due process because it purportedly creates a strict liability crime as the State need not prove any mental state as to the killing. But strict liability crimes do not necessarily violate due process. *See State v. Blake*, 197 Wn.2d 170, 179, 481 P.3d 521 (2021) ("the

legislature can still create strict liability crimes" as "'our legislature has the plenary power to criminalize conduct regardless of whether the actor intended wrongdoing'") (quoting *State v. Yishmael*, 195 Wn.2d 155, 163, 456 P.3d 1172 (2020)). Moreover, unlike strict liability crimes, which have no requisite mental state, *State v. Rivas*, 126 Wn.2d 443, 452, 896 P.2d 57 (1995), a conviction of felony murder requires the State to prove the requisite mental state of the predicate felony. *See State v. Bolar*, 118 Wn. App. 490, 504, 78 P.3d 1012 (2003) (citing *State v. Dennison*, 115 Wn.2d 609, 615, 801 P.2d 193 (1990)). Because the State charged Williams with second degree felony murder predicated on assault in the second degree, the State was required to prove Williams possessed the requisite mental state to be guilty of assault in the second degree. This did not criminalize innocent conduct; therefore, as applied to Williams, the felony murder statute does not violate due process.

Second, Williams also raises several policy arguments against the felony murder statute, including that Washington's felony murder statute is harsh, heavily criticized, the broadest in the country, and leads to disproportionate punishment. Williams' arguments generally reflect his disagreement with the legislature's decision to allow the crime of assault to serve as a predicate felony for felony murder. He claims his concerns "persist because the legislature explicitly stated that *any* felony assault is a valid predicate to felony murder." But "[i]t is the legislature's purview to decide what one can and cannot be punished for." *In re Postsentence Review of Leach*, 161 Wn.2d 180, 183, 163 P.3d 782 (2007). Thus, "whether the felony murder statute makes sound policy . . . is better directed to the legislature." *State v. Armstrong*, 143 Wn. App. 333, 343, 178 P.3d 1048 (2008).

Indeed, several members of our Supreme Court have urged the legislature to reconsider the felony murder statute,[1] yet the legislature has consistently rejected such pleas. *See* LAWS OF 2003, ch. 3, § 1.

Lastly, Williams claims that Washington's felony murder statute increases the subjectivity of the State's charging decision and allows the State to disproportionally charge Black defendants with murder by decreasing the State's burden of proving a defendant's mental state. On this point, *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), is instructive. In *Gregory*, our Supreme Court addressed the constitutionality of our state's death penalty. The court admitted as evidence a study on the effect of race on the imposition of the death penalty and ordered its commissioner to conduct additional fact-finding as part of its statutorily required review under RCW 10.95.100 (repealed by LAWS OF 2023 ch. 102 § 21). *Id.* at 12-13. The Supreme Court commissioner subsequently issued formal findings. *Id.* at 13. Reviewing those findings, the court held "Washington's death penalty [was] unconstitutional, as administered, because it [was] imposed in an arbitrary and racially-biased manner." *Id.* at 35.

---

[1] *See, e.g.*, *State v. Tamalini*, 134 Wn.2d 725, 744-45, 953 P.2d 450 (1998) (Sanders, J., dissenting) ("Washington has by far the broadest felony murder practice of any state in the union" and "stands virtually alone in allowing assault to serve as the predicate felony in a felony murder prosecution."); *In re Pers. Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002), *superseded by* LAWS OF 2003, ch. 3, § 1; *State v. Gamble*, 154 Wn.2d 457, 470-71, 476, 114 P.3d 646 (2005) (Madsen, J., concurring) (noting that Washington's felony murder rule is an "exceedingly harsh statutory scheme" and "encourag[ing] the legislature to take a closer look" and "consider altering" the felony murder statutory scheme); *Id.* at 476-77 (Chambers, J., concurring) (expressing specific concern with the "double standard" created by the legislature in that the felony murder statute "explicitly allows two people who commit the same offense to be charged and convicted of different crimes, perhaps because of their different background or socioeconomic status or merely the county in which they live"); *In re Pers. Restraint of Bowman*, 162 Wn.2d 325, 334-35, 172 P.3d 681 (2007) ("while the felony murder can, and does in some circumstances, result in unfairly harsh treatment that is not commensurate with the defendant's culpability, the legislature has expressed its intent to maintain the felony murder statutes").

Although Williams raises serious concerns about the racially disproportionate impact of the felony murder statute in Washington and these concerns are shared by numerous scholars and advocates,[2] the record before this court does not include findings similar to those in *Gregory* because Williams did not raise this issue below. Nor can this court conduct a hearing to make such findings itself because former RCW 10.95.100 (relied on by the Supreme Court in *Gregory*) does not apply here and, as our Supreme Court has repeatedly stated, "appellate courts are not fact-finders." *Dalton M, LLC v. N. Cascade Tr. Servs., Inc.*, 2 Wn.3d 36, 54, 534 P.3d 339 (2023) (citing *Garcia v. Henley*, 190 Wn.2d 539, 544, 415 P.3d 241 (2018)). Without such a record, we cannot properly address the merits of this argument.

C.     Offender Score Calculation

Williams next argues the sentencing court exceeded its statutory authority when it included his juvenile convictions in his offender score calculation. We disagree.

RCW 9.94A.525 governs a sentencing court's calculation of a defendant's offender score. Under the previous version of RCW 9.94A.525, courts considered juvenile offenses subject only to the same limitations that applied to adult convictions. *See State v. Troutman*, 30 Wn. App. 2d 592, 597, 546 P.3d 458

---

[2] *See* PERRY MORIEARTY, ET AL., *Race, Racial Bias, and Imputed Liability Murder*, 51 Fordham Urb. L.J. 675 (2024); NAZGOL GHANDNOOSH, ET AL., *Felony Murder: An On-Ramp for Extreme Sentencing*, Sentencing Project 24 (2022); G. BEN COHEN, ET AL., *Racial Bias, Accomplice Liability, and the Felony Murder Rule: National Empirical Study*, 101 Denv. L. Rev. 65, 113 (2023); Data: Washington, The Felony Murder Reporting Project. *See also State v. Morgan*, 4 Wn.3d 261, 282 n.1, 562 P.3d 360 (2025) (Knodell, J., concurring) (noting the felony murder doctrine has been criticized as "morally indefensible. . . and discriminatory," and that some studies conclude prosecutors charge felony murder disproportionately as a tool against defendants of color).

(2024); RCW 9.94A.598(1)(a).  Effective July 23, 2023, the legislature amended RCW 9.94A.525 and added subsection 1(b) prohibiting the inclusion of juvenile convictions which are not murder in the first or second degree or class A felony sex offenses from a defendant's offender score calculation.  RCW 9.94A.525(1)(b); LAWS OF 2023, ch. 415, § 2.  The issue presented here is which version of this statute applies to Williams' sentencing in May 2024 for offenses he committed in January 2021.

*Troutman* is instructive on this issue.  There, we addressed arguments similar to those Williams presents here regarding offender score calculations.  We noted that under RCW 9.94A.345,[3] the timing statute, and RCW 10.01.040,[4] the general savings clause statute, sentences imposed under the Sentencing Reform Act "'are generally meted out in accordance with the law in effect at the time of the offense.'"  *Troutman*, 30 Wn. App. 2d at 597-98 (quoting *State v. Jenks*, 197 Wn.2d 708, 714, 487 P.3d 482 (2021)).  Any exception to this general rule must be apparent by express legislative intent "'in words that fairly convey that intention.'"  *Jenks*, 197 Wn.2d at 720 (quoting *State v. Ross*, 152 Wn.2d 220, 238, 95 P.3d 1225 (2004)).  We held the plain language of RCW 9.94A.525, as amended, is unambiguous and does not establish the legislature's intent for the statute to apply retroactively.  *Troutman, 30 Wn.2d* at 599-600.  In accordance with RCW

---

[3] RCW 9.94A.345 provides:  "Except as otherwise provided in this chapter, any sentence imposed under this chapter shall be determined in accordance with the law in effect when the current offense was committed."

[4] RCW 10.01.040 provides:  "*Whenever any criminal or penal statute shall be amended or repealed, all offenses committed* or penalties or forfeitures incurred *while it was in force shall be punished* or enforced *as if it were in force*, notwithstanding such amendment or repeal, *unless a contrary intention is expressly declared in the amendatory or repealing act*, and every such amendatory or repealing statute shall be so construed as to save all criminal and penal proceedings, and proceedings to recover forfeitures, pending at the time of its enactment, unless a contrary intention is expressly declared therein." (Emphasis added.)

9.94A.345 and RCW 10.01.040, we concluded the law in effect at the time of the offense applies to a defendant's sentence. *Id.* Here too, the sentencing court did not err in counting Williams' juvenile convictions when calculating his offender score in accordance with the law in effect when Williams committed the offenses at issue.

D.    Excessive Fines Clause

Lastly, Williams argues the restitution order requiring him to pay $40,000, with interest, to the CVCP is grossly disproportionate and thus unconstitutional. We again disagree.

As a preliminary matter, the State argues Williams cannot challenge the restitution order on appeal because he agreed to it in the trial court. A defendant waives the right to challenge an alleged sentencing error for the first time on appeal "if the error involves agreement to facts, or the exercise of discretion." *State v. Cosgaya-Alvarez*, 172 Wn. App. 785, 790, 291 P.3d 939 (2013) (citing *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 873-74, 50 P.3d 618 (2002)). But a legal error in a sentence, including a legal error relating to restitution, can be raised for the first time on appeal. *State v. Ramos*, 24 Wn. App. 2d 204, 214, 520 P.3d 65 (2022) (citing *Cosgaya-Alvarez*, 172 Wn. App. at 790). Moreover, even in the absence of this legal principle, RAP 2.5(a)(3) would independently permit the court to address Williams' argument. *Id.* at 214-15 (court "will consider [Ramos's] indigency-based constitutional claims under RAP 2.5(a)").

Turning to the merits of Williams' excessive fines argument, *State v. Ellis*, 5 Wn.3d 549, 579 P.3d 37 (2025), is instructive. There, the defendant was ordered to pay restitution to the Crime Victims Compensation fund. *Id.* at 553-54. The total

amount of restitution ordered represented a portion of the funeral expenses for the defendant's victim. *Id.* at 554. On appeal, Ellis argued the imposition of restitution and interest violated the excessive fines clause of the United States and Washington constitutions because he was indigent and unable to pay the restitution. 562-63. Our Supreme Court disagreed, concluding Ellis's claim did not satisfy the first step of the excessive fines analysis because the restitution ordered was solely compensatory. *Id.* at 563-64. The court acknowledged that restitution can be both punitive and compensatory but concluded the restitution order was not punitive because "the amount ordered . . . was only the amount needed to compensate the CVC." *Id.* at 564. Thus, the court did not reach the second step of the inquiry to determine whether the fine was constitutionally excessive. *Id.*

Likewise here, Williams' claim does not satisfy the first step of the excessive fines inquiry because the entire amount of restitution ordered solely reimburses the CVCP for amounts it paid to cover Satterwhite's funeral costs and amounts it paid as pension benefits to Satterwhite's children. Thus, as in *Ellis*, the restitution ordered was not punitive. Additionally, the interest on the restitution amount is not subject to an excessive fines analysis. *See Ramos*, 24 Wn. App. 2d at 228 ("Because the legislature did not intend for interest to be a penalty and because interest accruing on restitution is paid to crime victims rather than to the government, interest on restitution awards is not punishment and not subject to an excessive fines clause analysis."). Williams' excessive fines argument thus fails.

Despite this, Williams argues the fact that the restitution ordered is payable to the CVCP does not make its impact on him any less punitive. Williams relies on *Ellingburg v. United States*, 607 U.S. __, 146 S. Ct. 564 (2026), but such reliance

- 14 -

is misplaced. In *Ellingburg*, the U.S. Supreme Court analyzed whether restitution ordered under the Mandatory Victims Restitution Act of 1996 (MVRA) violated the Ex Post Facto Clause because the defendant committed the crime for which restitution was ordered before the enactment of the MVRA. 146 S. Ct. at 566. The Court held that determining whether a law violates the Ex Post Facto Clause requires courts to evaluate whether the underlying statute imposes a criminal or penal sanction as opposed to a civil remedy. *Id.* at 566-67. Applying this test, the Court determined that restitution under the MVRA is "plainly criminal punishment for purposes of the Ex Post Facto Clause" in part because the MVRA labels restitution as a "penalty" for a criminal offense and restitution is imposed at sentencing together with or in lieu of other criminal punishments. *Id.* at 567.

By contrast here, Williams' restitution claim was brought under the excessive fines clause, not the Ex Post Facto Clause. Additionally, the restitution order compensating the CVCP for amounts paid to Williams' victim and the victim's family was ordered pursuant to Washington's Crime Victims' Compensation Act (CVCA), chapter 7.68 RCW, and Washington's restitution statute, RCW 9.94A.753. Under the CVCA, chapter 7.68 RCW, "[e]ach victim injured as a result of a criminal act . . . or the victim's family or beneficiary in case of death of the victim, are eligible for benefits in accordance with this chapter." RCW 7.68.070(1). And under RCW 9.94A.753(7), the trial court is required to order restitution "in all cases where the victim is entitled to benefits under the crime victims' compensation act, chapter 7.68 RCW." Accordingly, the CVCA "provides the framework to determine the amount of benefits a victim is entitled to, and the restitution statute, RCW 9.94A.753, mandates that a court order restitution in that amount." *State v.*

- 15 -

*Morgan*, 4 Wn.3d 261, 278-79, 562 P.3d 360 (2025). Unlike restitution ordered under the MVRA and analyzed in the context of an Ex Post Facto Clause analysis, restitution ordered under the CVCA and RCW 9.94A.753(7) solely to compensate and reimburse the CVCP for amounts paid to victims and their families is not punitive criminal punishment and not subject to an excessive fines clause analysis. *See Ellis*, 579 P.3d at 45-46. Williams' contrary argument fails.

Affirmed.

_Feldman, J._

WE CONCUR:

_Díaz, J._

_____, ACJ