# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54439-3-II |
| Respondent, | |
| v. | |
| GUADALUPE RAMOS LEIVA, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Guadalupe R. Leiva appeals his conviction for three counts of rape of a child in the second degree, one count of attempted rape of a child in the second degree, one count of assault in the second degree, and one count of felony harassment. Leiva also appeals his sentence for assault in the second degree and felony harassment. Leiva argues that the trial court erred by denying his motion for a mistrial based on a law enforcement officer's improper opinion testimony. Leiva also argues that the State presented insufficient evidence of a firearm to support his conviction for assault in the second degree and the firearm enhancements for assault in the second degree and felony harassment.

We hold that the trial court did not abuse its discretion by denying Leiva's motion for a mistrial. We also hold that the State presented sufficient evidence of a firearm to support his conviction for assault in the second degree and the two firearm enhancements. Accordingly, we affirm Leiva's convictions and sentence.

FACTS

I.    FACTUAL BACKGROUND

Leiva and Eugenia Ramos met as teenagers in Guatemala.  They eventually married.  In 2001, Leiva moved to the United States.  Ramos gave birth to A.S. 2001, after Leiva had left for the United States.  Ramos moved to the United States in 2003.

Ramos reunited with Leiva in 2005 and they eventually had three more children together.  In 2013, the family moved to a trailer just outside of Eatonville, Washington.  A.S. was 11 years old at the time.

Ramos worked as a nurse, frequently worked long hours, and was typically assigned the night shift.  Leiva remained at home with the children while Ramos worked.

Leiva sexually abused A.S. the first time at the Eatonville trailer.  Ramos had left for work and A.S. was in her room.  A.S. could not sleep, so she joined Leiva in the living room to talk to him.  Leiva asked A.S. if she had ever seen a penis.  When she said no, Leiva pulled his pants down and made her touch his genitals.  A.S. did not understand what was happening, but knew that it was not good.  Shortly thereafter, A.S. recalled going in a room with Leiva.  She could not recall whether Leiva "touch[ed her] private parts or if he was doing something with his mouth."  5 Report of Proceedings (RP) at 669.

The family eventually moved to a larger Eatonville residence.  A.S. was 12 years old at the time.  A.S. recalled another incident of sexual abuse.  Ramos was working the night shift.  A.S. was in her room sleeping when Leiva entered.  Leiva took A.S. to the room that he shared with Ramos.  He commented "about how [A.S.'s] body had changed and how he couldn't help himself anymore."  5 RP at 673.  Leiva "pulled down [A.S.'s] pants, and he put his penis into [her] vagina."  5 RP at 673.  A.S. cried and asked Leiva to stop, but he did not.

Leiva told A.S. not to tell anybody what had happened. To secure that demand, Leiva threatened to kill A.S., her family, and then himself. A.S. believed this threat "[b]ecause [they] had weapons for him to do that, and [because] he has been aggressive and abusive in the past." 5 RP 678.

A.S. stated that her family owned several guns. They had two revolvers: one was Ramos's and the other was Leiva's. A.S. knew that the revolvers worked because Leiva taught her how to use them and because she fired Leiva's before. A.S. said that the family also owned a small black gun that could be held with one hand—the same size as a pistol. A.S. further described the small black gun as the kind "where you insert the bullets from the bottom instead of into the revolver." 5 RP at 679. She was not sure if the small black gun was operational. A.S. also said that the family owned a longer gun, but was not sure if it was a shotgun or a rifle.

A.S. recalled another incident of sexual abuse in a red van that the family used to own. A.S. was either 12 or 13 years old during this incident. Leiva and A.S. were driving home one day when Leiva stopped along the side of a road. A.S. recalled crawling to the back of the van so that Leiva could have intercourse with her. By this point, A.S. became compliant with Leiva's demands:

> [The State:] You indicated at this point you were already compliant with his requests?
> [A.S.:] Yes.
> [The State:] Was there a time when you weren't compliant with his requests?
> [A.S.:] At the beginning I would cry a lot, and I would ask him to stop. I don't know when, but at one point I realized no matter what I did, he would still continue.
> [The State:] So what would happen if you yelled "Stop" or said "No" or tried to run away or anything like that?
> [A.S.:] He would remind me about his threat.

5 RP at 693.

3

A.S. recalled another specific incident that occurred on December 24, 2013. The family was celebrating Christmas at A.S.'s grandma's house, but Leiva and A.S. returned to their Eatonville residence to grab overnight supplies. As they were about to head back to A.S.'s grandma's house, Leiva told A.S. to go into his room. A.S. stated that, "whenever [Leiva] asked [her] to go into that room, [she] knew what he wanted," which was sexual intercourse. 5 RP at 696. A.S. recalled going back to her grandma's house and pretending like nothing happened.

A.S. said that she did not know how many times the sex abuse occurred, but she knew it was "a lot of times." 6 RP at 751. A.S. estimated that Leiva had sexually abused her over 50 different times.

Ramos discovered the ongoing sexual abuse on the night of October 12, 2014. A.S. stated that she and the family went out shopping that day. When they got back home, Leiva asked A.S. to go outside to check on the water tank. Ramos was inside the house watching TV. After they checked on the water tank, Leiva took A.S. to their greenhouse. A.S. "was really confused about what was happening because he had never done any sort of sexual act when [Ramos] was home." 5 RP at 708. When they entered the greenhouse, Leiva pulled A.S.'s pants down. That was when Ramos came outside.

Ramos's daughters normally say goodnight to her before bed. Ramos went to A.S.'s room, wondering why she had not said goodnight. Ramos felt something was wrong and started calling out A.S.'s name. Ramos saw Leiva walk out of the greenhouse, fixing his pants. A.S. walked out after Leiva. Ramos noticed that A.S. was "shaky and crying." 6 RP at 779.

Ramos demanded to know what has happening, but both A.S. and Leiva denied that anything had happened. Ramos then went into A.S.'s room and locked the door. A.S. told Ramos that night that Leiva had been sexually abusing her.

4

Leiva broke down the bedroom door and pulled Ramos by her hair into the living room. Ramos asked Leiva what he had done to her daughter and threatened to call the police. Leiva responded by "grab[bing] one of the pistols" and "[telling her] that if [she] called the police, he was going to kill [her], he was going to kill [her] kids, and he was going to shoot at the police, and then he would kill himself." 6 RP at 782-83. Ramos also testified to owning several guns. She stated that there was one rifle, a pistol, and another handgun in the house, which was Leiva's. Ramos's father gave her the rifle and the pistol. Ramos stated that the pistol worked. Leiva pointed the pistol at Ramos when he made the threat.

Ramos believed that Leiva would carry out his threat based on his abusive and aggressive past. Ramos then told Leiva to "calm down" and that she "wasn't going to say anything." 6 RP at 793. After Leiva left, she locked herself into a bedroom with the rest of her children and waited until dawn "because [she] was so scared that [Leiva] would come back to the house." 6 RP at 793. Ramos never called the police "[b]ecause [she] was very scared that [Leiva] would start shooting at them." 6 RP at 794. The next morning, Ramos took A.S. to be evaluated at the hospital.

Leiva testified that the guns in the household were actually cap guns, or BB guns, and not actual firearms. Leiva said that the guns "weren't capable of killing anybody." 8 RP at 1018.

Leiva left for Colorado after the greenhouse incident. Leiva withdrew $880 in cash, then travelled to Guatemala. He stayed there until he was extradited back to the United States on October 25, 2018.

By amended information, the State charged Leiva with three counts of rape of a child in the second degree, one count of attempted rape of a child in the second degree, one count of assault in the second degree, and two counts of felony harassment. The State also alleged several aggravators, including that the offenses were domestic violence incidents, that he abused his

5

position of trust, that the rapes were part of a continuing course of conduct, and that he was armed with a firearm when he committed the assault and felony harassment offenses. Leiva pleaded not guilty and the case proceeded to a jury trial.

II.    MOTION FOR A MISTRIAL

At trial, Leiva moved to prohibit the State and any witness from offering their personal opinion on the veracity of another witness, or on his veracity or guilt. The trial court granted Leiva's motion.

Gary Sanders, a detective sergeant for the Pierce County Sheriff's Department, testified at trial. Sanders was assigned to work on A.S.'s case. He testified that he observed A.S.'s forensic interview, but from a different room. Sanders testified as to A.S.'s demeanor during the interview, which Leiva objected to:

> [The State:]  And did you observe anything about her demeanor during the interview?
> [Sanders:]  Yeah. I hate to say typical victim, unfortunately, but, you know, very upset, very emotionally distraught. But also in the things that she described, the repetitive nature kind of—it showed —
> [Defense Counsel:]  I'm going to object. This is getting to commenting on the credibility of the witness, in this case the alleged victim, and vouching for her credibility.
> [The Court:]  I'll sustain that. You can rephrase.
> [The State:]  That's fine, Your Honor.
> [The State:]  Was there anything about [A.S.'s] demeanor that you observed other than what you've already described?
> [Sanders:]  She was distressed, but she was also calm, which was kind of disturbing in that fact.
> [The State:]  Why do you say that?
> [Sanders:]  Because—to say that someone is calm is to say that they've been conditioned with it, that it's been happening so much that they almost accept it, which is kind of sad. I mean, you could tell she was upset, but—
> [Defense Counsel:]  Your Honor, I'm going to object. Can I be heard outside the presence of the jury?

8 RP at 971-72.

6

Leiva moved for a mistrial based on Sanders's testimony. The State informed the court that it told Sanders about the ruling on Leiva's motion in limine, but that the questioning "was a bit too open-ended." 8 RP at 973. The court informed the parties that it was going to review the testimony in "realtime." 8 RP at 975.

The trial court denied Leiva's motion for a mistrial. The court stated that "[w]hat the detective [said] was wrong. It was in violation of my direction during motions in limine, and I want the detective cautioned before he comes back into this courtroom." 8 RP at 975. But the court noted that the detective made "one statement, one comment." 8 RP at 975-76. It did not believe that Sanders's statement rose to the level that anyone was unduly prejudiced. Specifically, the trial court stated that, "I did not observe anyone in the jury reacting to that comment. And I just reviewed the *Demery*[1] case in *Tegland*. So given everything that I've just looked at, everything that I've just reviewed on realtime, that's my ruling." 8 RP at 977.

The trial court promptly gave a curative instruction to the jury. Specifically, the court stated that, "I am admonishing the jury to disregard the detective's last comment. It was improper, and it was in violation of a previous order I had made in this case." 8 RP at 978. Defense counsel declined the court's offer to strike the statement from the record.

III.    JUDGMENT AND SENTENCE

The jury found Leiva guilty of three counts of rape of a child in the second degree, one count of attempted rape of a child in the second degree, one count of assault in the second degree, and one count of felony harassment. The jury found Leiva not guilty of one count of felony harassment. Relevant here, the jury also found that Leiva was armed with a firearm in committing assault in the second degree and felony harassment.

---

[1] *State v. Demery*, 144 Wn.2d 753, 30 P.3d 1278 (2001).

The trial court imposed a standard range sentence of 334 months to life incarceration, which includes two firearm enhancements for assault in the second degree and felony harassment. Leiva appeals.

## ANALYSIS

I.    MOTION FOR MISTRIAL

Leiva argues that the trial court violated his constitutional right to a fair trial by denying his motion for a mistrial based on Sanders's improper opinion testimony. We disagree.

A.    Legal Principles

"A witness's expression of personal belief about the veracity of another witness is inappropriate opinion testimony in criminal trials." *State v. Perez-Valdez*, 172 Wn.2d 808, 817, 265 P.3d 853 (2011). Opinion testimony invades the exclusive province of the jury and may be reversible error because it violates the defendant's right to an independent determination of the facts by the jury.[2] *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007); U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 21, 22.

When a defendant appeals a trial court's denial of a motion for a mistrial, we review the decision for an abuse of discretion. *State v. Allen*, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). An abuse of discretion occurs when the trial court's decision is contrary to law, manifestly unreasonable or based on untenable grounds. *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 807, 425 P.3d 807 (2018).

"A mistrial should be granted when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." *State v. Gamble*, 168 Wn.2d 161,

---

[2] Leiva argues that the opinion testimony by Sanders is an improper opinion of guilt. Leiva is mistaken. Sanders's comment was instead arguably a comment on the credibility of another witness, A.S.

177, 225 P.3d 973 (2010). We will overturn a trial court's decision denying a motion for a mistrial only when "there is a substantial likelihood that the prejudice affected the verdict." *Id*. Thus, we "look to three factors to determine whether a trial irregularity warrants a new trial: '(1) the seriousness of the irregularity; (2) whether the statement was cumulative of evidence properly admitted; and (3) whether the irregularity could be cured by an instruction.'" *Perez-Valdez*, 172 Wn.2d at 818 (quoting *State v. Post*, 118 Wn.2d 596, 620, 826 P.2d 172, 837 P.2d 599 (1992)). These factors are considered with deference to the trial court because the trial court is in the best position to discern any prejudice. *State v. Garcia*, 177 Wn. App. 769, 776-77, 313 P.3d 422 (2013).

B.      Trial Irregularity

Leiva argues that Sanders's improper opinion testimony is a "serious irregularity," which weighs in favor of a mistrial. Br. of Appellant at 14. We agree that the irregularity may be characterized as serious under *Gamble* because it involves an arguable violation of a pretrial order. But the level of seriousness is low, and so it does not justify a mistrial.

While "[a] violation of a pretrial order is a serious irregularity," *Gamble*, 168 Wn.2d at 178, we must also consider the degree of seriousness of the irregularity. In doing so, we ask "who was responsible for the errant testimony; whether it was the result of a witness who misunderstood or disregarded instructions or whether the witness was misinformed or uninformed as the result of the actions, or inaction, of one of the attorneys." *State v. Taylor*, 18 Wn. App. 2d 568, 581, 490 P.3d 263 (2021). Generally, the intentional introduction of inadmissible evidence is more serious than an unintentional interjection of inadmissible testimony. *Gamble*, 168 Wn.2d at 178.

Precedent can provide guidance. In *Perez-Valdez*, a child protective services (CPS) investigator vouched for the victims' credibility in a case where the defendant was charged with rape of a child in the second degree and rape of a child in the third degree:

9

A. . . . I'm saying these children knew what the parents' bedroom looked like, and in addition, they were in there several times being sexually abused by their father.
Q. Assuming they are telling you the truth?
A. *They are telling me the truth*.

172 Wn.2d at 812-13 (emphasis added). In that case, the Supreme Court concluded that the CPS investigator's statement was a serious trial irregularity "because [the] case hinged on whether the jury found the two victims to be credible." *Id*. at 818. Despite the serious irregularity, the court held that the trial court did not abuse its discretion in denying a motion for a mistrial. *Id*. at 819.

Like in *Perez-Valdez*, Sanders's testimony could be read to indirectly express an opinion on the credibility of A.S.'s allegation that she had been a victim of repeated sexual abuse:

[The State:] Was there anything about [A.S.'s] demeanor that you observed other than what you've already described?
[Sanders:] She was distressed, but she was also calm, which was kind of disturbing in that fact.
[The State:] Why do you say that?
[Sanders:] *Because—to say that someone is calm is to say that they've been conditioned with it, that it's been happening so much that they almost accept it, which is kind of sad*. I mean, you could tell she was upset, but—
[Defense Counsel:] Your Honor, I'm going to object. Can I be heard outside the presence of the jury?

8 RP 971-72 (emphasis added).

There is no evidence that the State intentionally sought to elicit Sanders's opinion on A.S.'s demeanor, which reduces the seriousness of the irregularity. *See Gamble*, 168 Wn.2d at 178. Specifically, the record demonstrates that the State informed Sanders of the court's pretrial order prior to testifying and acknowledged that its open-ended questioning prompted the subject testimony. Additionally, neither the State nor its witnesses revisited Sanders's comment on A.S.'s

demeanor in the forensic interview, which also reduces the seriousness of the irregularity.[3, 4] *See State v. Hager*, 171 Wn.2d 151, 160, 248 P.3d 512 (2011). Moreover, unlike the CPS investigator's comment in *Perez-Valdez*, Sanders did not directly vouch for the truthfulness of A.S.'s allegations. This further reduces the seriousness of the irregularity.

Because the State did not intentionally illicit testimony concerning A.S.'s credibility in violation of the pretrial order, and because Sanders did not directly vouch for A.S.'s credibility, we conclude that the trial irregularity is not as serious as the CPS investigator's statement in *Perez-Valdez*, 172 Wn.2d at 818. Accordingly, the first factor weighs against a mistrial.

C.      Cumulative Evidence

Leiva argues that the second factor weighs in favor of a mistrial because Sanders's "testimony did not involve cumulative evidence." Br. of Appellant at 14. We agree, but only in part, as Sanders's testimony involved more than cumulative evidence.

The second factor asks whether the subject testimony is cumulative of other properly admitted evidence at trial. *Perez-Valdez*, 172 Wn.2d at 818. If the improper opinion testimony is essentially cumulative of other evidence, then a mistrial may not be necessary. *Garcia*, 177 Wn. App. at 781.

---

[3] Leiva appears to contend that Sanders offered additional improper opinion testimony when he testified that "there's no question, I guess you would say, as to whether—who had done it." 8 RP at 985. This testimony is neither improper nor prejudicial. Sanders's statement was made in response to why he never took fingerprints in this case. Because both Ramos and A.S. made a strong identification of who the suspect was, and because this was not a stranger rape case, Sanders clearly meant to convey that there was no question as to who the suspect was—not that A.S.'s allegations were credible.

[4] Leiva also contends the prejudicial impact of Sanders's statement was compounded by the prosecutor's vouching of A.S.'s credibility in closing. At closing, the prosecutor said "the State has met [its] burden because [A.S.'s] testimony is compelling, it is true, and you know it to be true." 10 RP at 1259. Defense counsel objected to the statement, and the trial court sustained. However, this statement does not re-ring the bell of Sanders's improper opinion testimony.

Sanders's testimony was that A.S. appeared, based on her affect, to consider the abuse as normalized due to the large volume of sex acts. Here, A.S. testified that as time went on, she became compliant with Leiva's demands and conditioned to accept the reality of what was happening to her:

> [The State:] You indicated at this point you were already compliant with his requests?
> [A.S.:] Yes.
> [The State:] Was there a time when you weren't compliant with his requests?
> [A.S.:] At the beginning I would cry a lot, and I would ask him to stop. I don't know when, but at one point I realized no matter what I did, he would still continue.

5 RP 693. A.S. later reiterated this same point testifying that, as the frequency of the sex acts increased, "[she] would not do anything." 6 RP at 739. In fact, A.S. also testified that she became conditioned to make "deals" with Leiva, meaning that "[i]f [she] wanted to go out with some friends, [she] would have to [engage in sex acts] more often." 6 RP at 740. In fact, A.S.'s testimony established Leiva had sexually abused her over 50 different times.

While cumulative of the notion that A.S. ceased resisting due to becoming conditioned to the abuse, Sanders's testimony also covered his observation of A.S.'s demeanor, generally—to this extent only, Sanders's testimony was not cumulative of A.S.'s testimony. Accordingly, the second factor weighs in favor of a mistrial. *Garcia*, 177 Wn. App. at 781.

D. Curative Instruction

Leiva argues that the trial irregularity could not be cured by an instruction because an officer's testimony carries a special aura of reliability and because the improper opinion testimony goes to very essence of the crime. We disagree.

The third factor is "'whether the irregularity could be cured by an instruction.'" *Perez-Valdez*, 172 Wn.2d at 818 (quoting *Post*, 118 Wn.2d at 620). Generally, "[t]estimony from a law

enforcement officer regarding the veracity of another witness may be especially prejudicial because an officer's testimony often carries a special aura of reliability." *Kirkman*, 159 Wn.2d at 928. But, a prompt instruction to disregard improper opinion testimony may cure any prejudice against the defendant. *Perez-Valdez*, 172 Wn.2d at 818; *Hager*, 171 Wn.2d at 160. "We presume that juries follow the instructions and consider only evidence that is properly before them." *Perez-Valdez*, 172 Wn.2d at 818-19.

Improper opinion testimony may not always be curable by a jury instruction. *Hager*, 171 Wn.2d at 160. Our Supreme Court has stated,

> '[w]hile it is presumed that juries follow the instructions of the court, an instruction to disregard evidence cannot logically be said to remove the prejudicial impression created where the evidence admitted into the trial is inherently prejudicial and of such a nature as to likely impress itself upon the minds of the jurors.'

*Hager*, 171 Wn.2d at 160 (quoting *State v. Miles*, 73 Wn.2d 67, 71, 436 P.2d 198 (1968)). "[U]ltimately[,] the question is 'whether . . . , viewed against the background of all the evidence,' the improper testimony was so prejudicial that the defendant did not get a fair trial." *Gamble*, 168 Wn.2d at 177 (quoting *State v. Thompson*, 90 Wn. App. 41, 47, 950 P.2d 977 (1998)).

In *Hager*, the State charged the defendant with rape of a child in the first degree. 171 Wn.2d at 154. At trial, the State asked the testifying law enforcement officer what the defendant's demeanor was like on the day he made initial contact. *Id*. at 155. The officer answered that "[the defendant] appeared to be angry. He was evasive." *Id*. Hager moved for a mistrial based on the officer's improper opinion testimony, but the trial court denied the motion. *Id*.

On appeal, the Supreme Court held that the trial court did not abuse its discretion in denying Hager's motion for a mistrial because "[the officer's] description of Hager as 'evasive' was not so prejudicial that it could not be cured by the trial court's instructions." *Id*. at 160. Specifically, the court reasoned that "the statement regarding Hager's evasiveness was brief and was never

13

mentioned by the State or any of its witnesses again." *Id*. Additionally, the court concluded that the prejudice was slight when compared to Hager's inconsistent testimony regarding his whereabouts at the time of the alleged incident. *Id*.

Likewise, in *Perez-Valdez*, the Supreme Court held that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial based on a CPS investigator's improper opinion testimony. 172 Wn.2d at 819. As discussed above, the CPS investigator in that case vouched for the credibility of the victims' allegation that their father had sexually abused them by testifying that, "[t]hey are telling me the truth." *Id*. at 812-13. Although the statement was a serious trial irregularity, the court held that a prompt instruction cured any prejudice based on the trial court's observation that the statement

> happened so quickly [the jury] didn't even understand what was going on. It happened quickly. She made a quick statement. I told them to disregard it. I am convinced if we ask them, remember what that was all about? I'm convinced they wouldn't even remember what I was talking about. So I'm not convinced that that's tainted this jury.

*Id*. at 819.

Here, the trial court promptly instructed the jury to disregard Sanders's statement, noting that it was improper. We presume that the jury followed the trial court's instruction. *Perez-Valdez*, 172 Wn.2d at 818-19.

The Sanders's testimony about A.S.'s demeanor was not so prejudicial that it could not be cured by the trial court's instruction. Much like *Hager* and *Perez-Valdez*, Sanders's improper opinion testimony was but "one statement, one comment." 8 RP at 975-76. Neither the State nor its witnesses mentioned Sanders's comment on A.S's demeanor in the forensic interview again. Additionally, the prejudice here appears slight when compared to the statement offered by the CPS investigator in *Perez-Valdez* because Sanders did not directly vouch for A.S.'s credibility. The

14

prejudice also appears slight because the trial court "did not observe anyone in the jury reacting to [Sanders'] comment." 8 RP at 977. And when the court reviewed the challenged testimony in real time, it "[did] not believe that it [rose] to the level that [Leiva] was unduly prejudiced." 8 RP at 975-76.

As discussed above, we review a trial court's decision denying a motion for a mistrial for an abuse of discretion. *Allen*, 159 Wn.2d at 10. This standard of review gives deference to the trial court based on the "'the oft repeated observation that the trial judge, having seen and heard the proceedings, is in a better position to evaluate and adjudge than can we from a cold, printed record.'" *Perez-Valdez*, 172 Wn.2d at 819 (internal quotations omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

Given the trial court's assessment, and in light of the factors for a new trial, we hold that the trial court did not abuse its discretion in denying Leiva's motion for a mistrial. *See Allen*, 159 Wn.2d at 10.[5]

II.     SUFFICIENCY OF THE EVIDENCE

Leiva argues that the "State did not present sufficient evidence to prove that [he] was armed with a deadly weapon or firearm, and therefore failed to prove an essential element of second degree assault and failed to prove the firearm enhancement allegations." Br. of Appellant at 17. We disagree.

---

[5] Because we hold that the trial court did not abuse its discretion in denying Leiva's motion for a mistrial, we need not address his constitutional harmless error argument, which principally relies on *State v. Barr*, 123 Wn. App. 373, 98 P.3d 518 (2004). Regardless, Leiva's harmless error analysis is misplaced because the correct standard of review is abuse of discretion. *Allen*, 159 Wn.2d at 10.

A.    Legal Principles

Due process requires the State to prove every element of the charged crime beyond a reasonable doubt. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015). The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). In a sufficiency of the evidence claim, the defendant admits the truth of the evidence and the court views the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the State. *Id.* at 265-66. Credibility determinations are made by the trier of fact and are not subject to review. *Id.* at 266. Circumstantial and direct evidence are equally reliable. *Id.*

RCW 9A.36.021 provides in relevant part that "[a] person is guilty of assault in the second degree if he or she . . . (c) [a]ssaults another with a deadly weapon." A "deadly weapon" is defined as a "loaded or unloaded firearm." RCW 9A.04.110(6). "[A]ssault in the second degree is a class B felony." RCW 9A.36.021(2)(a).

RCW 9A.46.020(1)(a)(i) provides that, "[a] person is guilty of harassment if: (a) Without lawful authority, the person knowingly threatens: (i) To cause bodily injury immediately or in the future to the person threatened or to any other person." Under RCW 9A.46.020(2)(b)(ii), a person is guilty of a class C felony if "the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person."

A firearm enhancement increases the sentence for an underlying felony "if the offender or an accomplice was armed with a firearm" during the course of the crime. RCW 9.94A.533(3). "When the term 'sentence enhancement' describes an increase beyond the maximum authorized statutory sentence, it becomes the equivalent of an 'element' of a greater offense." *State v.*

*Recuenco*, 163 Wn.2d 428, 434, 180 P.3d 1276 (2008) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).  Therefore, "[t]he State must allege and prove beyond a reasonable doubt that the offender was 'armed with a firearm' during the commission of the charged crime." *State v. Johnson*, 185 Wn. App. 655, 674, 342 P.3d 338 (2015) (quoting *Recuenco*, 163 Wn.2d at 439-40).

A "firearm" is defined as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder."  RCW 9.41.010(11).  "The plain language of the statute does not require that the gun be 'operational' at the time of the offense." *State v. Olson*, 10 Wn. App. 2d 731, 738, 449 P.3d 1089 (2019).  "Evidence that a device appears to be a real gun and is being wielded in committing a crime is sufficient circumstantial evidence that it is a firearm." *State v. Tasker*, 193 Wn. App. 575, 594, 373 P.3d 310 (2016).

B.        Sufficient Evidence Supports That Leiva Threatened The Victims With A Firearm.

Here, the State presented sufficient evidence of what it was required to prove: that the object Leiva used was a gun, and therefore, a firearm.[6]  At trial, Ramos testified that Leiva pointed a pistol at her when she threatened to call the police after the greenhouse incident.  While possessing the pistol, Leiva threatened "to kill [her] children, . . . kill [her], and . . . kill himself with the police."  6 RP at 791.

Both A.S. and Ramos testified that their family owned guns.  A.S. testified that two of the guns were revolvers.  A.S. stated that she knew they were functional "[b]ecause [Leiva] taught [her] how to use them, and we fired them before."  5 RP at 678.  The family also had a small black gun which A.S. testified was the type "where you insert the bullets from the bottom instead of into the revolver."  5 RP at 679.  Ramos also testified that she owned a "pistol" that her father gave her

---

[6] The term "'Gun' has the same meaning as firearm."  RCW 9.41.010(12).

and that she knew it worked. 6 RP at 789. Neither of them testified to owning cap guns or BB guns.

Additionally, Ramos expressed fear based on Leiva's threat. Specifically, Ramos testified that as Leiva pointed the pistol at her, she told him to "calm down" and that she "wasn't going to say anything." 6 RP at 793. After Leiva left, she locked herself into a bedroom with the rest of her children and waited until dawn "because [she] was so scared that [Leiva] would come back to the house." 6 RP at 793. Additionally, Ramos believed Leiva's threats and chose not call the police "[b]ecause [she] was very scared that he would start shooting at them." 6 RP at 794.

Based on the A.S.'s and Ramos's personal knowledge, and based on the fear that Ramos expressed, it is reasonable to infer that the object that Leiva pointed at Ramos was a gun—not a toy. *See Cardenas-Flores*, 189 Wn.2d at 265-66. Therefore, viewing the evidence in light most favorable to the State, any rational trier of fact could conclude that Leiva threatened Ramos with a firearm to support the assault in the second degree conviction and the two firearm enhancements. *See Id.* at 265.

Leiva appears to contend that the State presented insufficient evidence of a firearm because the State did not offer the alleged firearm into evidence and did not call a firearms expert to testify, but rather, relied on A.S.'s and Ramos's lay testimony. We disagree. The admission of the alleged firearm and expert testimony is simply not required under *Tasker*, 193 Wn. App. at 595. Leiva's argument fails.

Based on the foregoing, the State presented sufficient evidence of a firearm. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Maxa, P.J.

_____
Price, J.