# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No.56287-1-II |
| Respondent, | |
| v. | |
| DENNIS RAY GIANCOLI, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.— Two men broke into Arlen Stebbins's house, tried to abduct Stebbins and his friend, John Fryer, at gunpoint, shot Stebbins, and tried to shoot Fryer. Stebbins and Fryer escaped. After police arrested Dennis Ray Giancoli as a suspect in the case, they listed him on a publicly available jail roster. Stebbins's wife then looked up pictures of Giancoli on social media and showed them to Stebbins. Stebbins later identified Giancoli to police as one of his attackers.

Before trial, Giancoli sought to exclude evidence about Stebbins's identification of him, including any in-court identification, because Stebbins's preview of social media pictures was highly suggestive. The trial court admitted the pretrial identification evidence and Stebbins identified Giancoli at trial as one of his assailants.

The jury convicted Giancoli of multiple charges, including two counts of first degree assault, one count of first degree burglary, and two counts of first degree kidnapping. Those charges were also all most serious "strike" offenses under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570. The jury found Giancoli was armed with a firearm during the assaults, burglary, and kidnappings. The jury also convicted Giancoli of first degree unlawful possession of a firearm, attempting to elude a pursuing police vehicle, and witness tampering.

Because Giancoli was convicted of multiple most serious offenses and his criminal history included two prior most serious offenses, the trial court sentenced Giancoli to life without the possibility of release as a persistent offender. The trial court also imposed 300 months of consecutive firearm sentencing enhancements on top of the life sentence.

Giancoli appeals. He argues that admitting Stebbins's pretrial and in-court identifications of him violated due process. He contends that there was insufficient evidence to convict him of unlawful possession of a firearm. Giancoli raises numerous issues related to his burglary and kidnapping convictions, and he asserts that the assault convictions merge into the kidnapping convictions. Giancoli also challenges his firearm sentencing enhancements. Finally, he argues that his mandatory life without the possibility of release sentence violates article I, section 14 of the Washington Constitution because he committed his first most serious offense when he was 17. Giancoli does not challenge his attempt to elude or witness tampering convictions on appeal.

The State concedes that we should reverse the burglary and kidnapping convictions. And it concedes that the assault convictions would otherwise merge with the kidnapping convictions if the kidnapping convictions are not reversed.

We accept the State's concessions regarding the burglary and kidnapping convictions, reverse those convictions, and remand for the trial court to vacate Giancoli's convictions for first degree burglary and first degree kidnapping. We also reverse the firearm sentencing enhancements. We otherwise affirm.

## FACTS

### I. BACKGROUND

Stebbins owned a property on the Key Peninsula where he stored extra tools and vehicles. He visited the property every few weeks. In November 2019, after noticing disturbances and missing items at the property, Stebbins and his friend Fryer decided to sleep in a mobile home on the property. The home had little furniture, so the two slept on couch cushions on the floor of the dining room.

Around 4:00 a.m., Stebbins and Fryer woke up to two men with guns standing over them. The men were looking for someone named Larry. One man was taller and carried a handgun; the shorter man carried a rifle. Giancoli was later identified as the tall man carrying the handgun and Christopher Conklin was identified as the man with the rifle. The men ordered Stebbins and Fryer outside, but told them to leave their wallets and cell phones behind in the trailer. The men directed them to get into a black Escalade at the end of the driveway. Both Stebbins and Fryer thought the men intended to kill them.

Giancoli struck Stebbins in the head with the gun when Stebbins objected, causing Stebbins to bleed profusely from a head wound. In the confusion, Fryer ran away and Conklin shot after him with the rifle but missed. After Fryer escaped, Conklin shot Stebbins in the legs. Stebbins somehow managed to flee and hide in the woods.

Both Stebbins and Fryer were eventually able to contact law enforcement. Police later pursued a black Escalade that wove in and out of oncoming traffic. After a flat tire disabled the Escalade near an apartment complex, Giancoli and Conklin fled on foot into a wooded area. Police recovered Giancoli and Conklin from the woods.

II. INVESTIGATION

Police brought Fryer to the apartment complex, where he identified Conklin as the man with the rifle, but he could not identify whether Giancoli was the man with the handgun. Stebbins did not participate in the identification at the apartment complex because he was at the hospital. Police arrested both Conklin and Giancoli.

Shortly after these events, Stebbins's wife looked up the names of the men arrested on a publicly available jail roster, then researched their social media profiles. She showed Stebbins pictures of Giancoli and Conklin from their social media pages.

In early December 2019, roughly two weeks after the incident, a detective showed Stebbins two photo montages to see if Stebbins could identify his assailants. The detective knew that Giancoli and Conklin were the suspects in the case. Stebbins signed an admonition that the montage may not contain a picture of his assailant and that he was not required to identify a suspect.

Each photo montage consisted of six jail booking photographs on a single page. One montage contained images of Giancoli and five people with similar characteristics, the other contained images of Conklin and five people with similar characteristics. Stebbins identified Giancoli and Conklin as his assailants. Several months later, the detective learned that Stebbins had previously seen their social media pictures.

Stebbins's DNA was found in several places inside the Escalade. Giancoli's DNA was on both the Escalade's steering wheel and a cigarette butt found on the porch of the mobile home. Law enforcement also recovered a .22 caliber rifle and several bullets from along the route that police pursued the Escalade. And police found .22 caliber rounds in a backpack in the Escalade,

as well as discharged .22 caliber casings on Stebbins's property. The handgun was never recovered.

The State charged Giancoli with two counts of first degree assault, one count of first degree burglary, and two counts of first degree kidnapping, all with firearm sentencing enhancements. The burglary charge alleged that Giancoli entered or remained unlawfully within a building with intent to commit a crime therein, and that while doing so, Giancoli "or an accomplice[] was armed with a firearm, to-wit: a rifle." Clerk's Papers (CP) at 67. The kidnapping charges alleged that Giancoli abducted Stebbins and Fryer with intent to "hold [each victim] as a shield or hostage," or "to inflict bodily injury on [each victim]," or "to inflict extreme mental distress on [each victim] or a third person," while Giancoli or an accomplice was armed with a rifle. CP at 67-69. The State also charged Giancoli with attempting to elude a pursuing police vehicle and first degree unlawful possession of a firearm. The State later added a charge of witness intimidation based on events while Giancoli was in jail awaiting trial.

### III. MOTIONS REGARDING IDENTIFICATION EVIDENCE

Before trial, the State moved to admit the photo montages shown to Stebbins. Giancoli opposed the motion and moved to prohibit any pretrial or in-court identifications by Stebbins and Fryer as "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." CP at 43. In particular, Giancoli argued that an in-court identification by Stebbins would not be reliable. Giancoli reasoned that Stebbins's wife's research tainted the pretrial photo montage identification, and that any in-court identification would be "highly suggestive" while Giancoli sat at the defense table. CP at 44.

The State argued that Stebbins's pretrial identification was not impermissibly suggestive because no state actor directed him to view the social media pictures of Giancoli and Conklin. "[L]aw enforcement did not show Mr. Stebbins the Facebook photos nor did they direct him or his wife to conduct their own research." CP at 58. And the State argued that there was "nothing unduly suggestive about the photo montages" the detective administered. *Id.*

The trial court reasoned based on *State v. Knight,* 46 Wn. App. 57, 729 P.2d 645 (1986), that "due process principles regarding suggestive photographic identifications have no application to pretrial photographic identification procedures engaged in by private citizens." Verbatim Rep. of Proc. (VRP) (July 12, 2021) at 87. Thus, it would be proper to suppress pretrial identification evidence "only where the State in some manner instigated and encouraged or counseled or directed or controlled the conduct." *Id.* at 88. "[A]nd the evidence does not show that in this case." *Id.*

The trial court ruled that the photo montages and Stebbins's pretrial identification of Giancoli were admissible. And it denied Giancoli's motion to prohibit an in-court identification. The trial court found "that Mrs. Stebbins was acting on her own" when "she did her own research." *Id.* at 91. "[A]lthough the charging documents were generated by the State of Washington, the [c]ourt doesn't find that the State encouraged her in any way." *Id.* The trial court also found that Stebbins's identification was reliable under the totality of the circumstances. The trial court stated that defense counsel was free to cross-examine Stebbins about his wife's research and the fact that "he saw a photograph," so "the objection goes more to the weight that the jury should give to the evidence rather than its admissibility." *Id.* at 90.

IV. TRIAL

A.    Testimony about the Incident

Giancoli and Conklin were tried as codefendants. At trial, Stebbins and Fryer testified consistent with the sequence of events recited above. Stebbins testified that he woke up around 4:00 a.m. to a man standing over him with a gun in one hand. A kitchen light was on, so there was some light allowing Stebbins to see. Although Stebbins was not familiar with firearms, he believed the gun pointed at him was a revolver. He primarily recalled staring down the barrel.

Fryer, who had personal experience with handguns, said that the gun was "a darkened brass" color, looked like it was made of metal, and was roughly seven inches long and five inches tall. VRP (July 29, 2021) at 453. He believed that it was a ".45 semiautomatic weapon" instead of a revolver, but he agreed that the man carrying it needed only one hand to hold it. *Id*. at 449.

Stebbins described the man with the handgun, who he later identified as Giancoli, as a "[t]all guy, kind of grizzly" and wearing a "ball cap." VRP (July 19, 2021) at 721. Fryer said the man with the handgun was about six feet tall and possibly Caucasian, although he looked "Mexican or Italian, [or] Greek." VRP (July 29, 2021) at 451. He recalled that the man wore a beanie, "hadn't shaved in awhile," and had gray facial hair. *Id*. at 452.

Stebbins identified Giancoli in the courtroom as the man with the handgun. Stebbins also explained to the jury that shortly after he got shot, his wife researched the jail roster for the names of the men arrested. She then looked up their names on social media. Stebbins testified that after looking at several pictures on social media, he believed both men were his assailants. This was before he had identified the men from the photo montages for the police.

Before the close of evidence, the parties stipulated that Giancoli had a prior conviction for a serious offense that prevented him from lawfully possessing a firearm.

B.      Jury Instructions and Closing Arguments

The trial court instructed the jury that it could decide what weight to give eyewitness identification testimony. The trial court told the jurors that they could weigh credibility based on factors including the witness's "capacity for observation, recall[,] and identification," their opportunity to observe the perpetrator, their emotional state, their ability to describe the perpetrator, and "[a]ny other factor relevant to this question." CP at 131.

The jury also received instructions about the elements and means of committing the charged offenses. A person commits first degree burglary by unlawfully entering or remaining in a building with intent to commit a crime therein, if they are armed with a deadly weapon or assault a person. RCW 9A.52.020(1). Even though the State charged Giancoli only with first degree burglary using a deadly weapon, the instructions stated that the jury could convict Giancoli of first degree burglary if he "was armed with a deadly weapon *or assaulted a person*." CP at 144 (emphasis added).

Next, the instructions directed that the jury could convict Giancoli of first degree kidnapping if it found that he abducted Stebbins and Fryer with intent to inflict bodily injury *or extreme mental distress*. The instructions told the jury it did not need to be "unanimous as to which of the alternative [means of kidnapping] has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt." CP at 150, 152.

8

Several instructions addressed Giancoli's possession or use of firearms. To convict Giancoli of unlawful possession of a firearm, the jury had to find that he had "previously been convicted of a serious offense" and that he "knowingly had a firearm in his possession or control." CP at 170. "Possession means having a firearm in one's custody or control." CP at 174. The instructions also stated that for the purpose of the special verdict forms for the firearm sentencing enhancements, the State had to prove that Giancoli "was armed with a firearm at the time" he committed the relevant offenses. CP at 190. The instructions explained that "If one participant in a crime is armed with a firearm, all accomplices to that participant are deemed to be so armed, even if only one firearm is involved." *Id*. Even though the information alleged that Giancoli was armed with a rifle for the firearm sentencing enhancements, the instructions did not direct the jury that it had to find that Giancoli or an accomplice was armed with a rifle to convict him of the firearm sentencing enhancements.

The State mentioned Giancoli used a handgun several times during closing argument. First, the prosecutor stated that the jury could convict Giancoli of unlawful possession of a firearm because both Stebbins and Fryer "testified about how he had a pistol that day" before summarizing their testimony describing the handgun. VRP (Aug. 3, 2021) at 657. And when discussing the special verdict forms for the firearm sentencing enhancements, the prosecutor explained that the relevant question was whether the State "proved beyond a reasonable doubt that [Giancoli and Conklin] were armed." *Id*. at 666. "And you heard the evidence in the case that one had a pistol and one had a rifle." *Id*. The prosecutor then told the jury that if one participant is armed with a firearm, all of the accomplices are also armed.

During defense closing argument, counsel conceded that the State had proved that Giancoli attempted to elude police in the Escalade. However, counsel argued that different men driving a different black Escalade committed the offenses at Stebbins's property. Counsel argued that Stebbins's identification was unreliable because of poor lighting in and around the mobile home, and counsel emphasized inconsistencies between Stebbins's initial description of the man with the handgun and Giancoli's appearance at trial. Counsel contended that Stebbins identified Giancoli from the photo montage because of his wife's social media search for the men arrested for the attack.

C.      Verdict and Sentencing

The jury convicted Giancoli of two counts of first degree assault, one count of first degree burglary, and two counts of first degree kidnapping. It entered special verdicts finding that Giancoli was armed with a firearm during those offenses. The jury also convicted Giancoli of attempting to elude police, first degree unlawful possession of a firearm, and the lesser included crime of witness tampering instead of witness intimidation.

Giancoli had two prior convictions for most serious or "strike" offenses. *See* RCW 9.94A.030(32).[1] One prior conviction was for a second degree assault committed when he was 17 years old. Although Giancoli was a juvenile, he was convicted in adult court. The other prior conviction was for a first degree burglary committed when he was 21. Because Giancoli's current convictions included most serious offenses, the trial court imposed a sentence of life without the possibility of release. Giancoli argued at sentencing that the POAA was unconstitutional as applied

---

[1] The statutory list of most serious offenses has been codified as different subsections since Giancoli's offenses but the relevant language has not changed, so we cite to the current subsection.

because his first "strike" offense occurred when he was 17 years old, but the trial court rejected this argument and did not believe it had discretion to impose a different sentence. Each most serious offense, as well as the burglary conviction, also carried a 60-month firearm sentencing enhancement that had to run consecutively to the life sentence and to the other enhancements for an additional 300 months.

Giancoli appeals his convictions and sentence.

Conklin also appealed, and we transferred Conklin's case to Division One. *State v. Conklin*, No. 84634-5-I, slip op. at 1 (Wash. Ct. App. May 8, 2022) (unpublished), https://www.courts.wa.gov/opinions/ pdf/846345.pdf. Division One concluded that Conklin failed to show the pretrial and in-court identifications were improper. *Id*. at 8-9. It also accepted several concessions from the State. That court first accepted the State's concession that Conklin's first degree assault convictions merged with his kidnapping convictions. *Id*. at 3. Then Division One reversed the kidnapping and burglary convictions, also based on State concessions. *Id*. at 3-5. That court concluded that Conklin's only remaining conviction was for unlawful possession of a firearm. *Id*. at 6. It remanded for the trial court to vacate the other convictions for assault, burglary, and kidnapping and to resentence Conklin on the remaining unlawful possession of a firearm conviction. *Id*. at 1. The State moved to reconsider, arguing that Conklin's assault convictions should remain intact. Division One denied reconsideration.

## ANALYSIS

### I. IDENTIFICATION EVIDENCE

Giancoli argues that Stebbins's identifications violated Giancoli's right to due process because the identification was obtained through impermissibly suggestive procedures and lacked

reliability. He contends that the photo montage was impermissibly suggestive because it should have been administered in a double-blind procedure and Stebbins should have been shown the images sequentially, not simultaneously. In contrast to his arguments below, Giancoli now argues that the social media search affected *only* the reliability of Stebbins's identification. He asserts that Stebbins's in-court identification was tainted for the same reasons "as it had no independent origin." Br. of Appellant at 40. We disagree.

As an initial matter, the State implies that Giancoli is confined to his argument below about only the social media research tainting the identifications. The case Giancoli uses to challenge other aspects of the photo montage procedure, *State v. Derri*, was published a year after his trial. 199 Wn.2d 658, 511 P.3d 1267 (2022). Although we may decline to consider new *issues* raised for the first time on appeal, the same is not true for new *authority*. *Walla Walla County Fire Prot. Dist. No. 5 v. Washington Auto Carriage, Inc.*, 50 Wn. App. 355, 357 n.1, 745 P.2d 1332 (1987) ("There is no rule preventing an appellate court from considering case law not presented at the trial court level."). Giancoli argued below that the pretrial identification procedure was impermissibly suggestive and unreliable; he maintains that claim on appeal, buttressed by authority that the Washington Supreme Court published after his trial. Thus, we consider Giancoli's arguments that are based on the analysis in *Derri*.

A.     Principles of Eyewitness Identifications

It is well established that "the due process clause of the Fourteenth Amendment compels exclusion of eyewitness identification evidence" that "was obtained by an unnecessarily suggestive police procedure" *and* "lacks reliability under the totality of circumstances." *Derri*, 199 Wn.2d at 673; *see State v. Vickers*, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). If a pretrial identification

procedure is inadmissible, a later in-court identification by the same witness is admissible only if the in-court identification "has an independent origin" from the tainted procedure. *State v. Hilliard*, 89 Wn.2d 430, 439, 573 P.2d 22 (1977). Whether an identification procedure was impermissibly suggestive or was unreliable are conclusions of law that we review de novo. *Derri*, 199 Wn.2d at 676.

To exclude evidence of a police identification procedure, a defendant must first show by a preponderance of the evidence that the procedure was impermissibly suggestive. *Id.* at 674. Without that showing, the inquiry ends. *Vickers*, 148 Wn.2d at 118. If the procedure was impermissibly suggestive, we then consider whether there was "'a very substantial likelihood of irreparable misidentification'" under the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). Factors that affect reliability include the witness's opportunity to view the person at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the person, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Id*. at 114-15. Further, "the corrupting effect of the suggestive identification itself" can weigh against reliability. *Id*. at 114.

The Supreme Court recently held in *Derri* that a court examining whether an identification procedure was impermissibly suggestive "must apply relevant, widely accepted modern science on eyewitness identification at each step of the test." 199 Wn.2d at 675.

> [W]e now know that identification procedures should be administered in double-blind fashion, meaning the administrator does not know who the suspect is. Police should give preidentification admonitions informing the witness that the perpetrator may or may not be in the montage and the witness should not feel compelled to

make a selection. They should never show the same suspect to the same witness over the course of multiple identification procedures. They should construct a photomontage in such a way that the suspect is not the only individual pictured who closely matches the description of the perpetrator. And they should avoid giving feedback to witnesses that might inflate confidence levels.

*Id*. at 677. These factors are each "potentially suggestive," but not automatically dispositive. *See id*. at 679, 682.

A combination of several factors rendered the identification procedure in *Derri* impermissibly suggestive. Among other issues, a detective administered the montages while knowing which image was the suspect, one witness was shown two montages where the defendant was the only common photo, the detective discussed the montages with the witnesses, and a federal agent who attended the identifications made comments "suggest[ing] unconscious confidence-bolstering." *Id*. at 682. The Supreme Court held that "each identification procedure" was impermissibly suggestive "for one or more of the reasons discussed above," but the identifications were nevertheless reliable under the totality of the circumstances. *Id*. at 685.

B.        Whether the Photo Montage Procedure in This Case Was Impermissibly Suggestive

Giancoli asserts that the photo montage procedure was impermissibly suggestive because it was not administered in a double-blind fashion and because Stebbins viewed the photos simultaneously. We disagree.

The *Derri* opinion originally said that police should "present photomontages sequentially, rather than simultaneously." *State v. Derri*, No. 100038-3, slip op. at 21 (June 23, 2022), https://www.courts.wa.gov/opinions/pdf/1000383.pdf. That sentence has since been removed from the opinion. Ord. Amending Op., *State v. Derri*, No. 100038-3, at 1 (Wash. Sept. 9, 2022),

https://www.courts.wa.gov/opinions/pdf/1000383.pdf. Thus, a witness simultaneously viewing the images of a montage does not currently weigh in favor of suggestibility.

Giancoli also argues that the photomontages were impermissibly suggestive because they were not performed in a double-blind fashion. The *Derri* court found multiple factors contributed to suggestiveness and it did not say that one factor is or should be dispositive. *See* 199 Wn.2d at 679. Here, the detective who administered the photomontages knew which people had been arrested. But this is the *only* remaining *Derri* factor that Giancoli identifies as weighing in favor of impermissible suggestiveness in this case. He points to no other factor, nor does he point to any evidence that the lack of double-blind presentation made any difference here. We conclude that the photomontages were not impermissibly suggestive here. We thus need not reach reliability. *Vickers*, 148 Wn.2d at 118. We affirm the trial court's order admitting Stebbins's pretrial and in-court identifications of Giancoli.

## II. UNLAWFUL POSSESSION OF A FIREARM

Giancoli argues that the State did not present sufficient evidence to support the unlawful possession of a firearm conviction. He asserts that the State never proved that he "possessed a 'gun in fact'" because Stebbins and Fryer gave conflicting descriptions of the handgun. Br. of Appellant at 66 (quoting *State v. Olsen*, 10 Wn. App. 2d 731, 737, 449 P.3d 1089 (2019)). He suggests the State had to prove the handgun was operable. We disagree.

To assess the sufficiency of the evidence, we ask whether, viewing the evidence in the light most favorable to the State, "'any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Frahm*, 193 Wn.2d 590, 595, 444 P.3d 595 (2019) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). A defendant challenging the sufficiency of the evidence

admits the truth of the State's evidence, and we draw all reasonable inferences in favor of the State. *Salinas*, 119 Wn.2d at 201. Circumstantial and direct evidence are equally reliable. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).

A person is guilty of first degree unlawful possession of a firearm when they own, possess, or control "any firearm after having previously been convicted . . . of any serious offense." Former RCW 9.41.040(1) (2019). "Possession means having a firearm in one's custody or control." CP at 174. A "firearm" is "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder," but excludes distress signals and construction tools. Former RCW 9.41.010(11) (2019). We recently dismissed an argument that the State had to prove a firearm was operable to convict a defendant of unlawful possession of a firearm. *Olsen*, 10 Wn. App. 2d at 738.

Here, sufficient evidence supported the conviction for unlawful possession of a firearm. Stebbins and Fryer both said that Giancoli held a handgun. Stebbins, who was unfamiliar with firearms, thought that the gun was a revolver but clearly recalled the sight of the gun's barrel pointed at his face. Fryer, who was more familiar with firearms, believed the gun was a semiautomatic and .45 caliber, described its approximate size, and stated that it was made of metal and not plastic. Giancoli offered no evidence that the gun was a toy. Taking the State's evidence as true and viewing the evidence in the light most favorable to the State, a reasonable jury could find that Giancoli possessed a firearm. And the parties stipulated that he had previously been convicted of a serious offense. We hold that sufficient evidence supports Giancoli's conviction for first degree unlawful possession of a firearm.

### III. FIRST DEGREE BURGLARY CONVICTION

Giancoli asserts that we must reverse his conviction for first degree burglary because the information charged him with only one alternative means of committing the burglary but the jury was instructed on two. And he raises several other grounds for reversing the burglary conviction. The State concedes that we should reverse the burglary conviction because the jury was instructed on an uncharged alternative means. Thus, the State does not address Giancoli's other arguments. We accept the State's concession.

A person commits first degree burglary if they enter or remain unlawfully in a building with intent to commit a crime therein, and the person or an accomplice is either "armed with a deadly weapon" or "assaults any person." RCW 9A.52.020(1). "It is error to instruct the jury on alternative means that are not contained in the charging document." *State v. Brewczynski*, 173 Wn. App. 541, 549, 294 P.3d 825 (2013). But if "other instructions clearly limit the crime to the charged alternative," the error is harmless. *Id*.

Here, the jury was instructed on an uncharged alternative means. The information alleged that Giancoli committed a burglary only while armed with a deadly weapon. But the jury was instructed that it could convict Giancoli if he or an accomplice "was armed with a deadly weapon *or* assaulted a person." CP at 144 (emphasis added). And the other instructions did not clearly limit the jury to considering whether Giancoli was armed with a deadly weapon during the burglary, as opposed to assaulting a person. We accept the State's concession and remand for the trial court to reverse Giancoli's burglary conviction and the attached firearm sentencing enhancement.[2]

---

[2] Giancoli also argues that we must reverse the burglary conviction because insufficient evidence supported the alternative means that he *entered* the building with intent to commit a crime and the jury did not receive a unanimity instruction. Entering and remaining unlawfully in a building are

## IV. FIRST DEGREE KIDNAPPING CONVICTION

Giancoli next argues that we must reverse his convictions for first degree kidnapping. He asserts that there was not sufficient evidence to support the extreme mental distress alternative means that the State charged for each kidnapping count and the jury did not receive a unanimity instruction. The State concedes that we must reverse Giancoli's kidnapping convictions for those reasons. We agree and accept the State's concession.

When a jury is instructed about alternative means of committing a crime, "[a] general verdict satisfies due process only so long as each alternative means is supported by sufficient evidence." *State v. Woodlyn*, 188 Wn.2d 157, 165, 392 P.3d 1062 (2017). "If there is insufficient evidence to support *any* of the means, a 'particularized expression' of jury unanimity is required." *Id*. (quoting *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014)). In other words, we must "revers[e] if it is impossible *to rule out the possibility* the jury relied on a charge unsupported by sufficient evidence." *State v. Wright*, 165 Wn.2d 783, 803 n.12, 203 P.3d 1027 (2009).

First degree kidnapping occurs when a person abducts another with intent to commit another offense, such as inflicting bodily harm or extreme mental distress. RCW 9A.40.020(1). Here, the State expressly told the jury that it did not have to be unanimous about whether bodily injury or extreme mental distress supported the first degree kidnapping conviction. Under the extreme mental distress means, the State must prove the defendant intended to inflict more mental distress than a reasonable person would feel when restrained by deadly force. *State v. Garcia*, 179 Wn.2d 828, 843, 318 P.3d 266 (2014). The State points to no testimony in the record to support

---

not alternative means of committing burglary. *State v. Smith*, 17 Wn. App. 2d 146, 157, 484 P.3d 550 (2021), *review denied,* 198 Wn.2d 1005, 493 P.3d 747. Because we reverse the burglary conviction on other grounds, we need not address this argument further.

this means, and the State concedes that sufficient evidence did not support the extreme mental distress alternative means. Thus, we accept the State's concession and remand for the trial court to reverse Giancoli's kidnapping convictions and the attached firearm sentencing enhancements.[3]

### V. REMAINING FIREARM SENTENCING ENHANCEMENTS

Two firearm sentencing enhancements remain attached to the assault convictions after the reversal of the burglary and kidnapping convictions. Giancoli contends that the jury instructions and the State's closing argument allowed the jury to find the firearm sentencing enhancements based on the handgun, but his information charged only enhancements based on the rifle. Thus, according to Giancoli, the enhancement findings could have improperly relied on an uncharged factual basis. For the first time in his reply brief, Giancoli contends that if we reverse the firearm sentencing enhancements we must also reverse the underlying assault convictions. The State contends that "any discrepancy between the information and the jury instructions was harmless." Br. of Resp't at 22. We reverse the firearm sentencing enhancements but affirm the assault convictions.

"Defendants must be informed of the charges against them, including the manner of committing the crime." *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 536, 309 P.3d 498 (2013). *See* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. As we explained above with regard to Giancoli's burglary conviction, it is error to instruct the jury on alternatives that are not contained in the information. *Brewczynski*, 173 Wn. App. at 549. But the error is harmless if "other instructions clearly limit the crime to the charged alternative." *Id*.

---

[3] Giancoli has not challenged the sufficiency of the evidence to support the other alternative means of committing first degree kidnapping, abducting another with intent to inflict bodily harm.

For example, in *State v. Jain*, the information charged the defendant with two counts of money laundering related to two specified properties in Granite Falls and Mill Creek. 151 Wn. App. 117, 122-23, 210 P.3d 1061 (2009). The trial court then admitted evidence of money laundering activities related to five other properties that were not identified in the information, and the jury instructions "did not require . . . the jury to find that Jain's money laundering involved any specific properties." *Id*. at 123. Division One reversed because the jury "could have returned a guilty verdict by finding that Jain committed acts not charged in the information, specifically acts relating to properties other than the Granite Falls and Mill Creek properties." *Id*. at 124.

Here, the information charged that, while committing the attached offenses, Giancoli or an accomplice was "armed with a firearm, to-wit: a rifle." CP at 66-67. The information did not mention the handgun, but there was extensive testimony at trial describing the handgun's size and color. The instructions explained that if one participant in a crime was armed with a firearm, all accomplices were also considered armed, even if there was only one firearm. But the jury instructions did not specify that the jury could convict Giancoli for the firearm sentencing enhancements based only on the rifle. And during closing arguments, the prosecutor implied that the jury could find that Giancoli was armed based on either the rifle *or* the handgun. VRP (Aug. 3, 2021) at 666 ("[Y]ou heard the evidence in the case that one had a pistol and one had a rifle."). We cannot tell whether the jury found, for purposes of the firearm sentencing enhancements, that Giancoli was armed with the handgun, which was not charged in the information, or the rifle, which was.

Had the State not elected to specifically identify the rifle as the firearm supporting the firearm sentencing enhancements in the charging document, there would be no error. Nothing in

the firearm sentencing enhancement statute requires the State to specify an individual firearm in the charging document. *See* former RCW 9.94A.533(3) (2018). But the decision to specify a firearm in the information led to an error in this case. Although *Jain* addressed crimes, not enhancements, the State's charging decision here created an analogous situation because the State elected to identify the rifle as the relevant firearm in the information, then argued based on both the rifle and the handgun in closing argument, and did not limit the jury to relying on the rifle in the instructions about the enhancement. The State has not shown that other instructions were limited to the charged alternative, the necessary showing for harmless error in this context. *Brewczynski*, 173 Wn. App. at 549.

Giancoli's assertion that we must also reverse the underlying assault convictions is a novel argument raised for the first time in his reply brief. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); *see* RAP 10.3(c). We therefore remand for the trial court to vacate the firearm sentencing enhancements but affirm the underlying assault convictions.

VI. SENTENCING ISSUES

A.    Merger

Giancoli argues that his convictions for first degree assault merge with his convictions for first degree kidnapping. He reasons that the State used the threat of deadly force that constituted the assault to also elevate the kidnapping charges to the first degree. "Absent the evidence of the assault," he "could have only been convicted of the lesser crime of kidnapping in the second degree." Br. of Appellant at 47. Thus, he asserts that we must vacate the assault convictions. The State initially conceded this issue in its briefing. But the State clarified at oral argument that, if we

reverse the kidnapping convictions, the State would no longer concede that the merger doctrine applied. As discussed above, we reverse the kidnapping convictions. We agree with the State that the merger doctrine no longer applies.

"[T]rial courts merge crimes to avoid *doubly punishing* behavior." *State v. Wilkins*, 200 Wn. App. 794, 805, 403 P.3d 890 (2017) (emphasis added); *see also State v. Whittaker*, 192 Wn. App. 395, 411, 367 P.3d 1092 (2016) (explaining that the merger doctrine applies *at sentencing* to correct double jeopardy violations). As discussed above, the State concedes that there was not sufficient evidence to support the extreme mental distress alternative means of kidnapping and that we must reverse Giancoli's kidnapping convictions. On remand, there will be no kidnapping convictions for the assaults to merge with. *See State v. Aguilar*, __ Wn. App. 2d ___, 534 P.3d 360, 376-77 (2023) (declining to reach double jeopardy arguments after reversing the convictions that implicated double jeopardy on other grounds). And Giancoli does not otherwise prevail on any challenge to his assault convictions.

We hold that our reversal of the first degree kidnapping convictions renders the merger doctrine inapplicable. We acknowledge that Division One reversed Conklin's assault convictions and that it would be ideal for codefendants to receive the same treatment. Although Division One declined to reconsider its opinion, here, the State clarified its position at oral argument and expressly limited the concession on the merger issue. We affirm Giancoli's convictions for first degree assault.

B.      POAA Sentence

Giancoli asserts that his life without the possibility of release sentence under the POAA is cruel punishment that violates article I, section 14 of the Washington Constitution because he

committed his first most serious offense when he was 17 years old. He also argues that the POAA sentence is categorically unconstitutional and disproportionate because POAA sentences are imposed in a racially disproportionate manner. We disagree.

The procedural basis for Giancoli's POAA sentence is functionally identical to *State v. Reynolds*, ___ Wn.2d ___, 535 P.3d 427, 431 (2023) . In that case, the Washington Supreme Court addressed the constitutionality of a mandatory sentence of life without the possibility of release under the POAA that was predicated on a "strike" offense that Reynolds committed when he was 17. *Id*. Reynolds pleaded guilty to first degree assault in adult court when he was 17 years old. *Id*. He committed his second set of "strike" offenses, first degree burglary and robbery, when he was 21 years old. *Id*. And he committed his third set of "strike" offenses, first degree burglary and second degree attempted rape, when he was 33 years old. *Id*. at 431-32.

Reynolds appealed his POAA sentence under article I, section 14 of the Washington Constitution, arguing that the sentence was categorically barred and unconstitutionally disproportionate when imposed on offenders who committed their first most serious offense as a juvenile. *Id*. at 432. The Supreme Court disagreed, emphasizing that Reynolds' previous criminal conduct aggravated his sentence but "his punishment is for his adult conduct." *Id*. at 438 (relying on *State v. Moretti*, 193 Wn.2d 809, 826, 446 P.3d 609 (2019), which held that a reviewing court considers the defendant's culpability at the time of the third most serious offense, not the first). Thus, the life without possibility of release sentence was not categorically unconstitutional nor unconstitutionally disproportionate.[4] *Id*. at 436-37.

---

[4] Because article I, section 14 is more protective than the Eighth Amendment, the Supreme Court did not separately discuss Reynolds' Eighth Amendment claim. *Reynolds*, 535 P.3d at 438 n.11.

Like Reynolds, Giancoli was prosecuted in adult court for the "strike" offense he committed when he was 17, second degree assault. He then committed two other most serious offenses at the ages of 21 and 49, second degree burglary and first degree assault. And he raises many of the same arguments that Reynolds did before the Supreme Court. *See Reynolds*, 535 P.3d at 432(explaining that Reynolds' Eighth Amendment and article I, section 14 challenges were based "on the fact that he committed his first strike as a juvenile rather than as an adult"). Thus, *Reynolds* and *Moretti* control. Giancoli has not established that his sentence was unconstitutional on the basis that he committed his first most serious offense as a juvenile prosecuted in adult court.

Giancoli also asserts that life without the possibility of release sentences are imposed in a racially disproportionate manner and do not comport with evolving standards of decency, rendering the sentences unconstitutional. Giancoli relies on *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), which ruled the death penalty unconstitutional on these grounds. *Gregory* held that the death penalty was unconstitutional largely because the penalty was "unequally applied— sometimes by where the crime took place, or the county of residence, or the available budgetary resources at any given point in time, or the race of the defendant," and failed to serve "any legitimate penological goal." 192 Wn.2d at 5. In contrast, the Supreme Court held in *Reynolds* that life without the possibility of release sentences for serious offenders satisfy the penological goals of retribution, deterrence, and incapacitation. *Reynolds*, 535 P.3d at 436. And the Supreme Court's remedy in *Gregory* was to convert all death sentences to life without the possibility of release. 192 Wn.2d at 35-36. As a result, we cannot conclude that life sentences without the possibility of release offend our evolving standards of decency in the same way that death sentences do without contradicting the Supreme Court's resolution of *Gregory*. *Id*.; *Reynolds*, 535 P.3d at 437-38.

No. 56287-1-II

In sum, a mandatory life without the possibility of release sentence is not unconstitutional when the defendant was convicted or pleaded guilty to all three most serious offenses in adult court. We therefore affirm Giancoli's sentence.

CONCLUSION

We remand for the trial court to vacate Giancoli's convictions for first degree kidnapping and first degree burglary, as well as the firearm sentencing enhancements. We otherwise affirm Giancoli's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, CJ

Glasgow, C.J.

We concur:

Lee, J.

Price, J.

25